UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,                    :

      -v.-                                      :

                             :

MICHAEL BERLINKA,
URS FREI, and                                :
ROGER KELLER,

         Defendants.                        :

- - - - - - - - - - - - - - - - - -x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: JAN 0 3 2012
```

INDICTMENT

12 Cr.        (    )

**12 CRIM 002**

## COUNT ONE
### (Conspiracy)

The Grand Jury charges:

### The Co-Conspirators and Their Bank

1.    At all times relevant to this Indictment, Swiss
Bank A provided private banking, asset management, and other
services to individuals and entities around the world, including
U.S. taxpayers in the Southern District of New York.  Swiss Bank
A provided these services through "client advisors" based in its
various branches in Switzerland ("Client Advisors").  Swiss Bank
A was principally owned by a small group of managing partners
("Managing Partners").  Swiss Bank A did not maintain an office
or branch in the United States, but it directly accessed the
U.S. banking system through a correspondent bank account held at
UBS AG ("UBS") in Stamford, Connecticut (the "Stamford
Correspondent Account").

2.    From in or about 2008 up through and including at least in or about 2010, MICHAEL BERLINKA, the defendant, worked as a Client Advisor at Swiss Bank A's Zurich branch (the "Zurich Branch").

3.    From in or about 2006 up through and including in or about 2011, URS FREI, the defendant, worked as a Client Advisor at Swiss Bank A's Zurich Branch.

4.    From in or about 2007 up through and including in or about 2011, ROGER KELLER, the defendant, worked as a Client Advisor at Swiss Bank A's Zurich Branch.  When KELLER was out of the office and could not communicate with, or provide services to, his U.S. taxpayer-clients, URS FREI, the defendant, served as KELLER's backup, and vice versa.

5.    From in or about 2005 up through and including in or about 2010, Client Advisor A, a co-conspirator not named as a defendant herein, worked as a Client Advisor at Swiss Bank A's Zurich Branch.  At various times, Client Advisor A also served as the "team leader" of MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, and other Client Advisors of the Zurich Branch.  As a team leader, Client Advisor A coordinated certain activities of, but did not supervise, these and other Client Advisors.

6.    From in or about 2007 up through and including in or about 2011, Managing Partner A, a co-conspirator not named as

a defendant herein, was one of the Managing Partners of Swiss
Bank A.  From in or about 2005 up through and including in or
about 2011, Managing Partner A was the head of Swiss Bank A's
Zurich Branch.  During that period, Managing Partner A
supervised MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the
defendants, Client Advisor A, and other Client Advisors in the
Zurich Branch with respect to, among other things, the opening
and servicing of "undeclared accounts" for U.S. taxpayers – that
is, bank and securities accounts for U.S. taxpayers in which the
assets, and the income generated in them, were not reported by
the U.S. taxpayers to the taxation authority of the United
States, the Internal Revenue Service ("IRS").

      7.   At all times relevant to this Indictment, Beda
Singenberger ("Singenberger"), a co-conspirator not named as a
defendant herein, owned, operated, and controlled an investment
advisory business based in Zurich called Sinco Treuhand AG
("Sinco Trust").  Beginning at least in or about 2000,
Singenberger, through Sinco Trust, served as an independent
asset manager for various U.S. taxpayers who held undeclared
accounts at Swiss Bank A, UBS AG ("UBS"), and other Swiss banks.
Singenberger helped U.S. taxpayers hide such accounts, and the
income generated therein, by, among other things, selling sham
corporations and foundations to U.S. taxpayers as vehicles
through which the U.S. taxpayers could hold their undeclared

accounts at UBS, Swiss Bank A, and other Swiss private banks, and by serving as the asset manager for U.S. taxpayers who held undeclared accounts at these banks. From at least in or about 2002 to in or about 2006, Singenberger regularly traveled to the Southern District of New York and other places in the United States to meet with his U.S. taxpayer-clients with undeclared accounts at UBS, Swiss Bank A, and other Swiss private banks.

8.   From in or about the mid-1990s up through and including in or about late 2008, Gian Gisler ("Gisler"), a co-conspirator not named as a defendant herein, worked as a client advisor at UBS in Switzerland. From in or about early 2009 up through and including in or about mid to late 2009, Gisler served as an independent asset manager at a Swiss asset management firm ("Swiss Asset Manager A") for U.S. taxpayers who held undeclared accounts at Swiss Bank A, UBS, and other Swiss banks. Gisler managed and/or assisted in opening at least seven undeclared accounts for U.S. taxpayers at Swiss Bank A. At all times relevant to this Indictment, Swiss Asset Manager A did not maintain an office in the United States.

## Obligations of United States Taxpayers With Respect to Foreign Financial Accounts

9.   At all times relevant to this Indictment, citizens and residents of the United States who had income in any one calendar year in excess of a threshold amount ("U.S.

4

taxpayers") were required to file a U.S. Individual Income Tax Return, Form 1040 ("Form 1040"), for that calendar year with the IRS. On Form 1040, U.S. taxpayers were obligated to report their worldwide income, including income earned in foreign bank accounts. In addition, when a U.S. taxpayer completed Schedule B of Form 1040, he or she was required to indicate whether "at any time during [the relevant calendar year]" the filer had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account," and if so, the U.S. taxpayer was required to name the country.

10. In addition, U.S. taxpayers who had a financial interest in, or signature or other authority over a foreign bank account with an aggregate value of more than $10,000 at any time during a particular calendar year were required to file with the IRS a Report of Foreign Bank and Financial Accounts, Form TD F 90-22.1 ("FBAR") on or before June 30 of the following year. In general, the FBAR required that the U.S. taxpayer filing the form identify the financial institution with which the financial account was held, the type of account (either bank, securities, or other), the account number, and the maximum value of the account during the calendar year for which the FBAR was being filed.

## Overview of the Conspiracy

11.   From at least in or about 2005 up through and
including in or about 2010, more than 100 U.S. taxpayer-clients
of Swiss Bank A conspired with, at various times, MICHAEL
BERLINKA, URS FREI, and ROGER KELLER, the defendants, and others
known and unknown, including Managing Partner A, Client Advisor
A, and other Client Advisors at Swiss Bank A, to defraud the
United States by concealing from the IRS undeclared accounts
owned by U.S. taxpayers at Swiss Bank A.   As of in or about
2010, the total value of such undeclared accounts was at least
$1.2 billion.   In particular, BERLINKA, FREI, KELLER, and other
Client Advisors opened dozens of new undeclared accounts for
U.S. taxpayers in or about 2008 and 2009 after UBS AG ("UBS")
and another large international bank based in Switzerland
("International Bank") closed their businesses servicing
undeclared accounts for U.S. taxpayers ("the U.S. cross-border
banking businesses") in the wake of widespread news reports in
Switzerland and the United States that the IRS was investigating
UBS for helping U.S. taxpayers evade taxes and hide assets in
Swiss bank accounts.   BERLINKA, FREI, KELLER, Client Advisor A
and other Client Advisors did so after the Managing Partners,
including Managing Partner A, affirmatively decided to take
advantage of the flight of U.S. taxpayer-clients from UBS by
opening new undeclared accounts for these U.S. taxpayers at

Swiss Bank A. As a result of this influx of former UBS U.S. taxpayer-clients into Swiss Bank A, Swiss Bank A's undeclared U.S. taxpayer assets under management, and the fees earned by managing those assets, increased substantially. As part of their sales pitch to U.S. taxpayer-clients who were fleeing UBS, at various times, BERLINKA, FREI, KELLER, and other Client Advisors told U.S. taxpayer-clients that their undeclared accounts at Swiss Bank A would not be disclosed to the United States authorities because Swiss Bank A had a long tradition of bank secrecy and, unlike UBS, did not have offices outside Switzerland, thereby making Swiss Bank A less vulnerable to United States law enforcement pressure. Managing Partner A and another executive of Swiss Bank A participated in some of these meetings. At various times, BERLINKA, FREI, and KELLER collectively managed undeclared U.S. taxpayer assets worth hundreds of millions of dollars.

### Means and Methods of the Conspiracy

12. Among the means and methods by which MICHAEL BERLINKA, URS FREI, and ROGER KELLER the defendants, and their co-conspirators carried out the conspiracy were the following:

a. BERLINKA, FREI, KELLER, and other Client Advisors opened and serviced undeclared accounts for U.S. taxpayers for the purpose of helping the U.S. taxpayers hide assets and income from the IRS.

b.    BERLINKA, FREI, and other Client Advisors opened and serviced undeclared accounts for U.S. taxpayer-clients in the name of sham corporations and foundations formed under the laws of Liechtenstein, Panama, Hong Kong, and other jurisdictions for the purpose of concealing the identities of the beneficial owners of those accounts -- that is, their U.S. taxpayer-clients -- from the IRS.

c.    FREI and other Client Advisors knowingly received and retained at Swiss Bank A documents that falsely declared that such sham entities were the beneficial owners of certain accounts, when FREI and the other Client Advisors knew that U.S. taxpayer-clients beneficially owned such accounts.

d.    BERLINKA, FREI, and other Client Advisors permitted certain U.S. taxpayers to open and maintain undeclared accounts at Swiss Bank A using code names and numbers (so-called "numbered accounts") so that the identities of the U.S. taxpayer-clients would appear on a minimal number of bank documents in the event that documents or databases were stolen from Swiss Bank A or otherwise fell into the hands of third parties.

e.    BERLINKA, FREI, KELLER, and others ensured that account statements and other mail for their U.S. taxpayer-clients were not mailed to them in the United States.

f.    BERLINKA, KELLER, and other Client Advisors sent e-mails and Federal Express packages to potential U.S. taxpayer-clients in the United States to solicit new private banking and asset management business.

g.    At various times from in or about 2005 up through and including in or about 2007, BERLINKA, FREI, KELLER, and other Client Advisors communicated by e-mail and/or telephone with U.S. taxpayer-clients who had undeclared accounts at Swiss Bank A.  Client Advisors sometimes used their personal e-mail accounts to communicate with U.S. taxpayers to reduce the risk of detection by law enforcement authorities.

h.    Swiss Bank A opened undeclared accounts for U.S. taxpayers referred to them by, and whose account opening paperwork was completed by, an investment advisor in Manhattan and a lawyer in Los Angeles, California.

i.    Beginning in or about late 2008 or early 2009, after Swiss Bank A began to open new undeclared accounts for U.S. taxpayers whose accounts were being closed by UBS, Managing Partner A instructed BERLINKA, FREI, KELLER and other Client Advisors of the Zurich Branch not to communicate with their U.S. taxpayer-clients by telephone or e-mail, and instead to cause their U.S. taxpayer-clients to travel from the United States to Switzerland to conduct business relating to their undeclared accounts.

j.   BERLINKA and other Client Advisors regularly permitted certain U.S. taxpayer-clients to repatriate funds from their undeclared accounts to the United States by causing Swiss Bank A to: (a) issue checks drawn on Swiss Bank A's Stamford Correspondent Account to the U.S. taxpayer-clients or their designated payees; and then (b) send the checks to the United States by private letter carrier.

k.   BERLINKA advised U.S. taxpayer-clients not to voluntarily disclose undeclared accounts to the IRS and assured them that their Swiss Bank A account information would not be disclosed to United States authorities.

l.   Various U.S. taxpayer-clients of BERLINKA, FREI, KELLER and other Client Advisors filed Forms 1040 that falsely and fraudulently failed to report the existence of, and the income generated from, their undeclared Swiss Bank A accounts; evaded substantial income taxes due and owing to the IRS; and failed to file FBARs identifying their undeclared accounts.

### Swiss Bank A Solicited New Undeclared Accounts Through a Third-Party Website

13.   From in or about 2005 up through and including in or about 2009, Swiss Bank A solicited new business from U.S. taxpayers wishing to open undeclared accounts in Switzerland by recruiting clients through the third-party website

10

"SwissPrivateBank.com."  As of on or about July 2, 2007, this website advertised "Swiss Numbered Bank Account[s]" and "Swiss Anonymous Bank Account[s]", among other things.  Specifically, the website stated:

> Swiss banking laws are very strict and it is illegal for a banker to reveal the personal details of an account number unless ordered to do so by a judge.
>
> This is long established in Swiss law. Any banker who reveals information about you without your consent risks a custodial sentance [sic] if convicted, with the only exceptions to this rule concerning serious violent crimes.
>
> Swiss banking secrecy is not lifted for tax evasion. The reason for this is because failure to report income or assets is not considered a crime under Swiss banking law. As such, neither the Swiss government, nor any other government, can obtain information about your bank account. They must first convince a Swiss judge that you have committed a serious crime punishable by the Swiss Penal Code.

The website invited users to "[r]equest a Swiss banking consultation today" by clicking a link to a "Consultation Request" form that asked for information about a user's country of residence, telephone number, and e-mail address.  The third-party website operator provided this information to Swiss Bank A Client Advisors, who then sent e-mails from Switzerland to the United States, among other places, promoting Swiss Bank A's private banking and asset management services.  In this manner, MICHAEL BERLINKA and ROGER KELLER, the defendants, and other Client Advisors collectively sent more than 100 such e-mails to

the United States soliciting new business.   In certain cases where U.S. taxpayers responded to such e-mails, Client Advisors sent by Federal Express hard copies of the bank's promotional materials to U.S. taxpayers in the United States.   This process eventually resulted in Swiss Bank A obtaining new undeclared accounts holding millions of dollars in total for U.S. taxpayers.   Managing Partner A and other managing partners of Swiss Bank A received quarterly updates on the progress of this advertising program.   Managing Partner A approved all payments to the website operator.

14.   As a result of this and other business development efforts, the total value of undeclared accounts held by U.S. taxpayers at Swiss Bank A increased substantially over time.   As of in or about 2005, Swiss Bank A hid approximately $240 million in undeclared assets for U.S. taxpayer-clients.   By in or about 2010, this amount rose to at least $1.2 billion.

### Swiss Bank A Opens New Undeclared Accounts For U.S. Taxpayers Fleeing UBS

15.   In or about May and June 2008, the United States Government's criminal investigation of UBS's U.S. cross-border banking business became publicly known and received widespread media coverage in Switzerland and the United States.   At or about that time, many U.S. taxpayers with undeclared accounts at UBS began to understand that the investigation might result in

the disclosure of their identities and UBS account information to the IRS.

16.   On or about July 17, 2008, UBS announced that it was closing its U.S. cross-border banking business.   Thereafter, UBS client advisors began to notify their U.S. taxpayer-clients that UBS was closing their undeclared accounts.   Some UBS client advisors told such clients that they could continue to maintain undeclared accounts at Swiss Bank A and certain other Swiss private banks.   At or about that time, it became widely known in Swiss private banking circles that Swiss Bank A was opening new undeclared accounts for U.S. taxpayers.

17.   In or about 2008, the Managing Partners affirmatively decided to take advantage of the flight of U.S. taxpayers with undeclared accounts by opening new undeclared accounts for many of them at Swiss Bank A.   Thereafter, in or about 2008 and 2009, Swiss Bank A opened new undeclared accounts for at least 70 U.S. taxpayers.   Most of these were opened at Swiss Bank A's Zurich Branch.

18.   In or about 2008, Managing Partner A announced this decision to certain personnel of the Zurich Branch.   At or about the time of this announcement, another Swiss Bank A executive ("Executive A") stated to personnel of the Zurich Branch that Swiss Bank A was not exposed to the risk of prosecution that UBS faced because Swiss Bank A was smaller than

UBS, and that Swiss Bank A could charge high fees to its new U.S. taxpayer-clients because these clients were afraid of prosecution in the United States.

19.  At or about the time Managing Partner A announced this decision, Managing Partner A supervised the creation of a list of Client Advisors at the Zurich Branch who were available to meet with potential U.S. taxpayer-clients who walked into the Zurich Branch without an appointment seeking to open new undeclared accounts.  Thereafter, in or about 2008 and 2009, MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, and other Client Advisors met with many new potential U.S. taxpayer-clients who arrived at Swiss Bank A with and without appointments.  In these meetings, BERLINKA, FREI, KELLER and other Client Advisors interviewed the potential U.S. taxpayer-clients about their backgrounds, the sources of their funds, and the amount of money they wished to transfer from UBS to Swiss Bank A, among other things.  In many cases, Managing Partner A or Executive A joined these interviews.  During these meetings, the U.S. taxpayers typically presented their U.S. passports for inspection and/or copying; advised that that they were U.S. citizens or legal permanent residents of the United States; confirmed that UBS was closing their accounts; and completed certain account opening documents.  These documents typically included a standard Swiss banking form called "Form A," which

clearly identified the U.S. taxpayer as the beneficial owner of the account.  In some cases, as described in more detail below, the Client Advisors sought to reassure their new U.S. taxpayer-clients that Swiss Bank A would not disclose their identities or account information to the IRS.

20.  In preparation for these meetings, Managing Partner A and Executive A supervised videotaped training sessions with Client Advisors of Swiss Bank A's Zurich Branch to instruct them on their delivery of certain selling points to be made to U.S. taxpayers fleeing UBS.  These selling points included the fact that Swiss Bank A had no branches outside Switzerland and was small, discreet, and, unlike UBS, not in the media.

21.  In this manner, Swiss Bank A opened new undeclared accounts for at least 70 U.S. taxpayers.  When such accounts were opened, they were designated with a special code that indicated to personnel within Swiss Bank A, among other things, that the accounts were undeclared.  At some point in or about 2008 or 2009, the Zurich Branch required that the opening of all new U.S. taxpayer accounts had to be approved by Managing Partner A or Executive A.

22.  From in or about March 2009 up through and including in or about October 2009, approximately 14,000 U.S. taxpayers voluntarily disclosed to the IRS undeclared accounts

held at banks around the world, including Swiss Bank A.  As part of this process, dozens of U.S. taxpayers requested from Swiss Bank A copies of their account records so that they could fully disclose their accounts to the IRS.  Swiss Bank A complied with many of these requests.  The records that Swiss Bank A sent to the United States included transaction confirmations and other documents listing the names of many Swiss Bank A Client Advisors, including MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants.  In response to the expected disclosure of the names of Client Advisors to the IRS through these records, in or about 2009, Managing Partner A announced to certain personnel within the Zurich Branch that the format of certain Swiss Bank A account-related documents would be changed so that the name of the Client Advisor would no longer appear on these documents.  On a rolling basis from in or about late 2009 up through and including in or about early 2010, this change was implemented such that the names of the Client Advisors no longer appeared on certain records relating to undeclared accounts held by U.S. taxpayers, and "Team International," or a similar designation, appeared instead.

        23.  In or about mid-2009, Swiss Bank A stopped opening new undeclared accounts for U.S. taxpayers but did not, at that time, close its existing undeclared U.S. taxpayer accounts.  In or about August 2011, Swiss Bank A sent letters to

U.S. taxpayer-clients stating that it had "decided to no longer serve US persons" effective December 31, 2011.

24.  In or about the end of 2009 or the beginning of 2010, after Swiss Bank A stopped opening new undeclared accounts for U.S. taxpayers, MICHAEL BERLINKA, the defendant, and Executive A opened at least three new undeclared accounts for U.S. taxpayers.  Each of these U.S. taxpayers had at least two passports -- one from the United States and one from a second country -- and each had recently been expelled from Swiss Bank No. 1, a Swiss private bank that maintained an office in the Southern District of New York until in or about 2008.  In each case, BERLINKA and Executive A opened the new undeclared account under the passport of the second country, even though BERLINKA and Executive A were well aware that the U.S. taxpayer had a U.S. passport.

### New Undeclared Accounts Opened by MICHAEL BERLINKA

25.  In or about 2008 and 2009, in the wake of widespread attention in the Swiss media to the Department of Justice's criminal tax investigation of UBS, MICHAEL BERLINKA, the defendant, opened and managed new undeclared accounts for numerous U.S. taxpayers, including the following:

### Client A

26.  Client A lived with her husband in Boca Raton, Florida, at all times relevant to this Indictment and became a

naturalized citizen in 2003.  In or about 1987, Client A became
the beneficial owner of an undeclared account at UBS and its
predecessor bank; at various times her husband was a joint owner
of the account.  In or about July 2008, Client A's UBS client
advisor, Gian Gisler, advised Client A and her husband that she
must close her UBS account because she was American.  Gisler
instructed Client A and her husband not to call UBS from the
United States, and told them that he was leaving UBS.  Gisler
invited Client A to move her account with Gisler to another
bank, but she declined.  Gisler then recommended Swiss Bank A
and noted that it was a reliable bank that had no offices in the
United States.

27.   In or about September 2008, Client A and her
husband traveled to Zurich to close her UBS account.  By that
time, Gisler had left UBS and Client A had a new UBS client
advisor.  The new UBS client advisor instructed them not to call
from the United States, promised that UBS would not give their
information to U.S. authorities, and endorsed Swiss Bank A as a
bank at which to hold their account.

28.   During the same trip to Zurich in September 2008,
Client A and her husband walked to Swiss Bank A and met with
MICHAEL BERLINKA, the defendant.  BERLINKA interviewed Client A
and her husband about their personal background and the source
of their funds, among other things.  Client A and her husband

18

informed BERLINKA that they were U.S. citizens, provided their U.S. passports for copying, and informed BERLINKA they would be transferring funds from UBS. BERLINKA opened a new account beneficially owned by Client A using the code name "N1641" on or about September 19, 2008. At that time, Swiss Bank A received, and thereafter maintained in its files, a Form A signed by Client A stating that Client A was the beneficial owner of the account. In addition, Swiss Bank A received and thereafter maintained in its files another form stating that Client A was "a U.S. citizen"; was "the beneficial owner of all income from US sources deposited in the [account] in accordance with US tax law; and "was not entitled to or does not want to claim any reliefs [sic] from United States Withholding Tax."

29. MICHAEL BERLINKA, the defendant, told Client A and her husband that they would be safe at Swiss Bank A and that BERLINKA had been instructed not to disclose their account information to United States authorities. In addition, BERLINKA instructed Client A and her husband not to call or send faxes to Swiss Bank A from the United States and explained that Swiss Bank A would not send mail to them in the United States.

30. On multiple occasions in or about 2008 and 2009, Client A or her husband called BERLINKA from the United States to notify him that they would be traveling to Aruba. Once in Aruba, Client A or her husband called and/or faxed BERLINKA to

request that he send checks to them in the United States. In
response, BERLINKA sent checks drawn on the Stamford
Correspondent Account from Switzerland to Client A in Boca
Raton, Florida by private letter carrier. All the checks, which
were payable to Client A, later cleared through the Stamford
Correspondent Account. In addition, the checks were issued in
the amount of $8,500 to help avoid detection of the account by
the IRS. The checks included the following:

| Check No. | Approximate Date of Check | Approximate Amount |
|-----------|---------------------------|--------------------|
| 3416 | 11/25/2008 | $8,500 |
| 3417 | 11/25/2008 | $8,500 |
| 3418 | 11/25/2008 | $8,500 |
| 3468 | 01/05/2009 | $8,500 |
| 3469 | 01/05/2009 | $8,500 |
| 3470 | 01/05/2009 | $8,500 |
| 3510 | 02/26/2009 | $8,500 |
| 3511 | 02/26/2009 | $8,500 |
| 3512 | 02/26/2009 | $8,500 |
| 3552 | 04/21/2009 | $8,500 |
| 3553 | 04/21/2009 | $8,500 |
| 3554 | 04/21/2009 | $8,500 |
| 3659 | 08/25/2009 | $8,500 |
| 3660 | 08/25/2009 | $8,500 |
| Total: | | $119,000 |

31. In or about September 2009, Client A and her
husband received a letter informing them that their names and
UBS account information might be provided to the IRS in
connection with the August 2009 agreement between UBS and the
United States to disclose bank records relating to approximately
4,450 U.S. taxpayers who had undeclared accounts at UBS.
Alarmed by this news, Client A's husband called BERLINKA from

the United States to raise this issue.  On this call, BERLINKA advised Client A's husband not to make a voluntary disclosure to the IRS and assured him that their account information would not be provided to the IRS.

32.  As of on or about October 8, 2008, Client A's undeclared Swiss Bank A account held approximately $2,332,860 million.

### Clients B and C

33.  MICHAEL BERLINKA, the defendant, also opened and managed an undeclared account for a married couple, Clients B and C.  At all times relevant to this Indictment, Clients B and C were U.S. citizens and residents of Florida.

34.  In or about 2008, UBS notified Clients B and C that they must close their undeclared UBS account, which they had maintained since the late 1990s.  Client B asked Gisler, his former UBS client adviser, who by then had moved to another firm, if he knew anyone at Swiss Bank A who could help them move their account out of UBS.  Gisler recommended MICHAEL BERLINKA, the defendant, and helped arrange a meeting between Clients B and C and BERLINKA at Swiss Bank A's office in Zurich in or about October 2008.  At that meeting, Clients B and C showed BERLINKA their U.S. passports, provided their U.S. address, stated that they wanted to deposit approximately $900,000, and noted that UBS was closing their account.  During this meeting,

BERLINKA was joined by Managing Partner A.  Managing Partner A further interviewed Clients B and C about their personal background, among other things.  Thereafter, Managing Partner A approved the opening of an undeclared account for Clients B and C.

35.  At the time this account was opened, Swiss Bank A received and thereafter maintained in its files a Form A stating that Clients B and C resided in Florida and were the beneficial owners of the account.  Attached to the Form A for Clients B and C were copies of their U.S. passports.  In addition, MICHAEL BERLINKA, the defendant, agreed on behalf of Swiss Bank A that it would not send mail to Clients B and C in the United States and that Clients B and C could conduct business with Swiss Bank A using a code name, "N1677."  And because Client B did not want to use his real name when he called Swiss Bank A from the United States, BERLINKA set up the account so that Client B could use another code name -- "Elvis" -- when calling from the United States.  Thereafter, on one or two occasions, Client B called BERLINKA from the United States to check his approximate account balance, which BERLINKA provided to Client B.

36.  As of on or about December 31, 2008, the undeclared Swiss Bank A account owned by Clients B and C held approximately $873,958.

37.   Some of the U.S. taxpayer-clients with undeclared accounts whose Client Advisor was MICHAEL BERLINKA, the defendant, are described in the following table.   None of these U.S. taxpayers timely reported their Swiss Bank A accounts (or the income earned therein) to the IRS on Form 1040 or the FBAR where they were required to do so.

| Beneficial Owner(s) | Code Name(s) or Nominee Name(s) in which Swiss Bank A Account(s) Held | Approximate Dates of UBS Account(s) | Approximate Date Swiss Bank A Account(s) Opened | Approximate High Value of Swiss Bank A Accounts |
|---|---|---|---|---|
| Client A | N1641 | 1987-2008 | 09/2008 | $2,544,609 |
| Clients B and C | N1677; Elvis | 1998-2008 | 10/2008 | $873,000 |
| Client D | Limpopo Foundation | 1970s-2008 | 12/2008 | $30,895,000 |
| Client E | Hackate Foundation | 1999-2008 | 12/12/2008 | $1,241,644 |
| Total | | | | $35,554,253 |

## New Undeclared Accounts Opened by URS FREI

38.   From in or about 2006 up through and including in or about 2010, URS FREI, the defendant, opened and/or serviced dozens of undeclared accounts for U.S. taxpayers.   As of in or about 2006, FREI managed undeclared accounts for approximately 20 U.S. taxpayers holding approximately $40 million in assets.   By in or about 2010, FREI managed undeclared accounts for approximately 50 U.S. taxpayers holding approximately $260 million in assets.   Within Swiss Bank A's Zurich Branch, other client advisors frequently sought FREI's advice concerning their undeclared U.S. taxpayer accounts, and some of those client advisors transferred such accounts to him. In or about 2006 and 2007, FREI traveled several times to the

United States for U.S. taxpayer-client business. In particular, in or about August and September 2007, FREI traveled to New York, New York, and to San Diego, San Francisco, Marina del Rey, and Santa Monica, California. In addition, from on or about October 19, 2006 to on or about August 31, 2009, FREI sent approximately 16 Federal Express packages relating to Swiss Bank A U.S. taxpayer-client business to addresses in the United States, including several packages sent to potential new U.S. taxpayer-clients.

39. In or about 2008 and 2009, in the wake of the widespread attention in the Swiss media relating to the United States Government's criminal investigation of UBS's U.S. cross-border banking business, URS FREI, the defendant, opened new undeclared accounts for numerous U.S. taxpayers, including the following:

### Clients F and G

40. For example, URS FREI, the defendant, served as the client advisor at Swiss Bank A for two separate undeclared accounts maintained by two brothers ("Clients F and G") who were, at all times relevant to this Indictment, U.S. citizens and residents of Bayside, New York.

41. In or about August 2008, Clients F and G traveled from New York to Zurich to meet with their client advisor at UBS, where they had held separate undeclared accounts since in

or about the 1960s.  The UBS client advisor informed Clients F and G that they must close their UBS accounts, and that other U.S. taxpayers with undeclared accounts were transferring funds to other Swiss banks, including Swiss Bank A.

42.  Clients F and G then walked to the Zurich Branch of Swiss Bank A, which was nearby, and asked to open a new account for each of them.  They were received by URS FREI, the defendant.  FREI interviewed Clients F and G and inspected their U.S. passports.  Clients F and G told FREI that they wanted to transfer assets from UBS to Swiss Bank A.

43.  FREI opened separate undeclared accounts for Clients F and G and assisted with the transfer of their funds from UBS to Swiss Bank A: approximately $3.4 million for Client F and $800,000 for Client G.  In addition, FREI established the accounts in code names ("N1 PULTUSK" and "N1 DREW" respectively) so that their names would appear on a minimal number of records relating to their accounts.

44.  After opening their accounts, FREI gave his business card to Clients F and G and told them to call him if they needed anything.  Thereafter, on multiple occasions in or about 2008 and 2009, Clients F and/or G called FREI from the United States and spoke to FREI or one of his assistants about the status and growth of their accounts.

45.   As of in or about October 2009, the undeclared Swiss Bank A accounts owned by Clients F and G held approximately $3.4 million and $800,000 respectively.

### Clients H and I

46.   URS FREI, the defendant, also served as the client advisor at Swiss Bank A for an undeclared account maintained jointly by Clients H and I.  At all times relevant to this Indictment, Clients H and I were U.S. citizens and residents of New Jersey.

47.   In or about November 2008, Clients H and I's UBS client advisor notified them that they must close their undeclared UBS account.  Client H asked his UBS client advisor to refer him to another Swiss bank so that Clients H and I could continue to maintain an undeclared account.  The UBS client advisor recommended Swiss Bank A and two other Swiss banks.

48.   Clients H and I walked to the Zurich Branch of Swiss Bank A and were received by URS FREI, the defendant.  FREI told Clients H and I that he handled American accounts for Swiss Bank A.  FREI interviewed Clients H and I about their personal background and the amount they wished to deposit.  Clients H and I showed their U.S. passports to FREI and told him that they would transfer a total of approximately $1 million from UBS to Swiss Bank A.

49.   On or about November 13, 2008, URS FREI, the defendant, opened a new account for Clients H and I.  At that time, Swiss Bank A promised Clients H and I that they could conduct business with the bank using the code name "N5771." Swiss Bank A also promised not to send mail to Clients H and I in the United States.  In addition, FREI instructed Clients H and I not to call him from the United States.  Later, in or about July 2009, FREI lifted this restriction after Clients H and I informed him that they had disclosed their Swiss Bank A account to the IRS.

50.   As of on or about July 14, 2009, the undeclared Swiss Bank A account owned by Clients H and I held approximately $1,105,593.

## Clients J and K

51.   URS FREI, the defendant, also opened and managed an undeclared Swiss Bank A account for Clients J and K, a married couple.  At all times relevant to this Indictment, Clients J and K were United States citizens living in Los Angeles, California.

52.   In or about 2008, Clients J and K, who had maintained an undeclared account at UBS and one of its prececessor banks since in or about the 1980s, were advised by their UBS client adviser that they must close their undeclared UBS account.  Clients J and K then spoke to an attorney in Los

Angeles ("the Los Angeles Attorney"), who advised them to create
an offshore entity and open an account in the name of the entity
with URS FREI, the defendant, at Swiss Bank A.   Thereafter, in
or about November 2008, at the Los Angeles Attorney's office,
Clients J and K completed account opening documents for a new
account to be held at Swiss Bank A in the name of White Tower
Holdings, LLC, a corporation formed under the laws of Nevis.
These documents included (1) a Form A stating that Clients J and
K, U.S. citizens living in Los Angeles, California, were the
beneficial owners of the White Tower Holdings; (2) copies of the
U.S. passports of Clients J and K, which were attached to the
Form A; (3) a separate bank form in which Clients J and K
falsely stated that White Tower Holdings (rather than Clients J
and K) was the "beneficial owner of all income from US sources
deposited in the above-mentioned portfolio(s), in accordance
with US tax law[]"; and (4) Forms W-9 signed by Clients J and K,
even though the account was undeclared.   The Los Angeles
Attorney then sent the signed documents to FREI at Swiss Bank A.

        53.   In or about November 2008, Clients J and K
traveled to Zurich and Client K met with URS FREI, the
defendant, at Swiss Bank A.   FREI advised Client K that mail
would not be sent to Clients J and K in the United States.   FREI
also advised that ROGER KELLER, the defendant, would be FREI's
secondary contact at the bank.   (Client K eventually met KELLER

on a later trip.)  The next day, Clients J and K met with FREI again to discuss the wiring of their funds from UBS to Swiss Bank A.

54.  As of on or about September 30, 2009, the undeclared Swiss Bank A account owned by Clients J and K held approximately $614,408.

### Clients L and M

55.  URS FREI, the defendant, was also the client advisor for an undeclared account maintained at Swiss Bank A by Clients L and M, a married couple.  At all times relevant to this Indictment, Clients L and M were U.S. citizens and residents of Florida.

56.  In or about December 2008, the UBS client advisor for Clients L and M notified them that they must close their undeclared UBS account, which they had held in the name of an entity called the Magabri Foundation, a sham foundation incorporated under the laws of Liechtenstein.  The UBS client advisor further informed Clients L and M that they could open an account at Swiss Bank A.  The UBS client advisor spoke to URS FREI, the defendant, on behalf of Clients L and M and learned that FREI was willing to open a new account for them in the name of the Magabri Foundation, the sham entity through which Clients L and M had held their undeclared UBS account.

57.   The UBS client advisor then arranged for, and accompanied Clients L and M to, a meeting with URS FREI, the defendant, at Swiss Bank A's Zurich Branch in or about January 2009.   At or about that time, FREI was informed that Clients L and M were U.S. citizens living in Florida, and that UBS was closing their account.

58.   On or about January 12, 2009, URS FREI, the defendant, opened two new undeclared accounts for Clients L and M in the name of the Magabri Foundation.   At that time, Swiss Bank A received and thereafter maintained in its files a Form A declaring that Clients L and M were the beneficial owners of the accounts and attaching their U.S. passports.   In addition, Swiss Bank A promised not to send mail to Clients L and M in the United States, and FREI instructed Client L not to call him from the United States.   FREI lifted the instruction not to call from the United States in or about November 2009 after Client L notified FREI that he had disclosed the Magabri Foundation accounts to the IRS.

59.   As of on or about December 31, 2009, the undeclared accounts owned by Clients L and M at Swiss Bank A held approximately $2,729,318.

60.   Some of the undeclared U.S. taxpayer-clients of URS FREI, the defendant, are described in the following table. None of these U.S. taxpayers timely reported their Swiss Bank A

accounts (or the income earned therein) to the IRS on Form 1040 or the FBAR where they were required to do so.

| Beneficial Owner(s) | Code Name(s) or Nominee Name(s) in which Swiss Bank A Account(s) Held | Approximate Dates of UBS Account(s) | Approximate Date Swiss Bank A Account(s) Opened | Approximate High Value of Swiss Bank A Accounts |
|---|---|---|---|---|
| Client F | N1 PULTUSK | 1960s - 2008 | 08/2008 | $3,200,000 |
| Client G | N1 DREW | 1960s - 2008 | 08/2008 | $800,000 |
| Clients H and I | N5571 | 2006 - 2008 | 11/13/2008 | $1,105,593 |
| Clients J and K | White Tower Holdings | 1980s - 2008 | 11/6/2008 | $614,408 |
| Clients L and M | Magabri Foundation | 1997 - 2009 | 1/12/2009 | $2,729,318 |
| Clients N and O | Efraim Foundation | 1973 - 2008 | 06/2008 | $52,747,000 |
| Arthur Joel Eisenberg | N1126 | 1983 - 2008 | 12/10/2008 | $2,234,608 |
| Total | | | | $60,980,927 |

## New Undeclared Accounts Opened by ROGER KELLER

61.  From in or about 2007 up through and including at least in or about 2010, ROGER KELLER, the defendant, opened and serviced undeclared accounts for dozens of U.S. taxpayers.  By in or about the end of 2008, KELLER managed undeclared accounts for at least 30 U.S. taxpayers holding approximately $120 million in total.  On or about February 9, 2007, and December 15 and December 16, 2008, KELLER sent approximately three Federal Express packages relating to Swiss Bank A U.S. taxpayer-client business to addresses in the United States.

62.   In or about 2008 and 2009, in the wake of widespread attention in the Swiss media to the United States Government's criminal investigation of UBS's illegal U.S. cross-border banking business, ROGER KELLER, the defendant, opened new undeclared accounts for numerous U.S. taxpayers, including the following:

### Client P

63.   For example, ROGER KELLER, the defendant, served as the client advisor for an undeclared account maintained by Client P.   At all times relevant to this Indictment, Client P was a U.S. citizen and resident of Maryland.

64.   In or about 2008, UBS advised Client P that he must close his undeclared UBS account, which he had maintained since in or about 1970.   Because Client P's deteriorating health did not permit him to travel to Switzerland, Client P's son traveled to Zurich in or about November 2008 to close Client P's UBS account and identify another Swiss private bank that would allow Client P to maintain an undeclared account.   When Client P's son asked Client P's UBS client advisor where he should move Client P's money, the UBS client advisor gave the names of three Swiss banks, one of which was Swiss Bank A.   Client P's son chose Swiss Bank A.

65.   On or about November 3, 2008, Client P's son walked into Swiss Bank A's Zurich Branch without an appointment

and asked to open an account.  ROGER KELLER, the defendant,
interviewed Client P's son.  Client P's son told KELLER that he
and Client P were U.S. citizens who lived in the United States
and that Client P had held an account at UBS for a long time.

66.  On or about the following day, November 4, 2008,
ROGER KELLER, the defendant, advised Client P's son that his
supervisor had approved the opening of a new account for Client
P, so long as the account was opened in the name of Client P's
son because Client P was not present in Zurich.  KELLER then
opened an account in the name of Client P's son.  At that time,
Swiss Bank A received and thereafter maintained in its files a
Form A stating that Client P's son, who lived in Manhattan, was
the sole beneficial owner of the account.  A copy of Client P's
son's U.S. passport was attached to the Form A.  In addition, at
the time the account was opened, Swiss Bank A received and
thereafter maintained in its files a document stating that
Client P's son was "the beneficial owner of all income from US
sources deposited in the [account] in accordance with US tax
law."  Further, on the same document, with respect to the
application of any double taxation treaty, Client P's son stated
that he was "not entitled to or does not want to claim any
reliefs [sic] from United States Withholding Tax."  Swiss Bank A
promised not to send account statements or other mail relating
to the account to the United States.

33

67.   As of on or about September 30, 2009, Client P's undeclared Swiss Bank A account held approximately $732,938.

### Client Q

68.   ROGER KELLER, the defendant, was also the client advisor for an undeclared Swiss Bank A account owned by Client Q.  At all times relevant to this Indictment, Client Q was a U.S. citizen and resident of California.

69.   In or about December 2008, Client Q's UBS client advisor informed him that he must close his undeclared UBS account, which he had owned since in or about 1987.  Thereafter, Client Q's previous UBS client advisor told him that Swiss Bank A was willing to open new undeclared accounts for U.S. taxpayers.

70.   In or about January 2009, because Client Q was unable for health reasons to travel to Zurich to close his UBS account, his son traveled in his place.  Client Q's previous UBS client advisor set up an appointment at Swiss Bank A and accompanied Client Q's son to meet with ROGER KELLER, the defendant, and a Swiss Bank A Zurich Branch supervisor on or about January 5, 2009.  At this initial meeting, KELLER and the supervisor interviewed Client Q's son about his personal background, the source of the funds, and the amount that he wished to deposit, among other things.  Client Q's son informed KELLER and the supervisor that he was a U.S. citizen and that he

wanted to transfer approximately $7 million from UBS to Swiss Bank A.

71.   Later that day, ROGER KELLER, the defendant, advised Client Q's son by telephone that Swiss Bank A would open an account for him.   Client Q's son then returned to the bank and completed various paperwork.   At that time, KELLER asked Client Q's son whether he wanted to complete an IRS Form W-9, a form through which a U.S. taxpayer can identify himself as such to a bank and thereby require the bank to report the U.S. taxpayer's account income to the IRS on a Form 1099 each year. Client Q's son advised KELLER that he did not wish to complete the Form W-9.   In addition, KELLER agreed that Swiss Bank A would not send mail relating to the account to the United States.

72.   KELLER and Client Q's son discussed what had occurred with respect to UBS's cross-border banking business, and KELLER assured Client Q's son that Swiss Bank A was a very old and well-established bank.

73.   In or about August 2009, the United States and UBS reached an agreement providing that UBS would disclose to the IRS account records for approximately 4,450 of its undeclared U.S. taxpayer-clients.   The following month, Client Q and his son traveled to Zurich and met with ROGER KELLER, the defendant, and a Swiss Bank A lawyer.   In the context of a

discussion about the news that UBS would disclose 4,450 account files to the IRS, KELLER and the Swiss Bank A lawyer assured Client Q and his son that Client Q's account was safe and that their names would not be released to the United States authorities.

74. As of on or about March 31, 2010, Client Q's undeclared Swiss Bank A account held approximately $7,173,679.

75. Client P, Client Q, and four other undeclared U.S. taxpayer-clients of ROGER KELLER, the defendant, are described in the following table. None of these U.S. taxpayers timely reported their Swiss Bank A accounts (or the income earned therein) to the IRS on Form 1040 or the FBAR where they were required to do so.

| Beneficial Owner(s) | Code Name(s) or Nominee Name(s) in which Swiss Bank A Account(s) Held | Approximate Dates of UBS Account(s) | Approximate Date Swiss Bank A Account(s) Opened | Approximate High Value of Swiss Bank A Accounts |
|---|---|---|---|---|
| Client P | Client P's Son | 1970-2008 | 2008 | $732,938 |
| Client Q | Client Q's Son | 1987-2009 | 1/5/2009 | $7,173,679 |
| Clients R & S | Client R's financial advisor | 1970s | 12/19/2008 | $3,667,724 |
| Clients T & U | TMT Family Foundation | 1981-10/2008 | 11/2008 | $1,247,649 |
| Total | | | | **$12,821,990** |

## New Undeclared Accounts Opened by Client Advisor A

76.   From in or about 2005 up through and including in or about 2010, Client Advisor A opened and serviced at least seven U.S. taxpayer-clients with undeclared accounts at Swiss Bank A.  From on or about October 9, 2006 to on or about April 15, 2009, Client Advisor A sent dozens of Federal Express packages relating to Swiss Bank A U.S. taxpayer-client business to addresses in the United States.

77.   In or about 2008 and 2009, in the wake of widespread attention in the Swiss media to the U.S. Government's criminal investigation of UBS, Client Advisor A and other Swiss Bank A client advisors opened and thereafter serviced numerous new undeclared U.S. taxpayer accounts.

## Client V

78.   For example, Client Advisor A opened and maintained an undeclared account for Client V at Swiss Bank A. Client V was, at all times relevant to this Indictment, a U.S. citizen and resident of Florida.

79.   Beginning in or about 2005, Client V owned undeclared accounts at UBS and the International Bank.  In or about 2008 and 2009, both UBS and the International Bank required Client V to close his undeclared accounts.

80.   On or about April 14, 2009, Client V's client advisor at International Bank informed Client V that Swiss Bank

A was opening new undeclared accounts for U.S. taxpayers who were being expelled from the International Bank.  Client V then walked to the Zurich Branch of Swiss Bank A, arrived without an appointment, and asked to open an account.

81.  At that time, Client Advisor A interviewed Client V about his personal background, the source of his funds, and how much he wished to deposit at Swiss Bank A, among other things.  Client V told Client Advisor A that UBS and International Bank were closing his accounts; showed Client Advisor A his U.S. passport; and told Client Advisor A that he wished to deposit approximately $5.7 million.  Client Advisor A, with the express approval of Managing Partner A, agreed to open the account through a "structure" -- that is, a sham offshore entity -- rather than in Client V's own name.

82.  To establish the "structure," on or about that same day, April 14, 2009, Client Advisor A invited an employee of a Swiss trust and fiduciary company that provides tax and legal services ("Swiss Trust Advisor A") to meet with Client V. At that meeting, Swiss Trust Advisor A then sold Client V an off-the-shelf sham entity incorporated under the laws of Panama called the Nitro Foundation.  Client Advisor A, in turn, opened a new account at Swiss Bank A for Client V in the name of the Nitro Foundation.  In written materials that Swiss Trust Advisor A provided to Swiss Bank A, Swiss Trust Advisor A acknowledged

that Client V's account would be undeclared.  At that time,
Swiss Bank A received and thereafter maintained in its files a
Form A declaring that Client V, a U.S. citizen and resident of
Florida, was the beneficial owner of the Nitro Foundation
account.  In addition, Swiss Bank A promised that it would not
send mail to Client V in the United States.  Thereafter, Client
V instructed UBS and the International Bank to transfer his
funds to the Nitro Foundation account at Swiss Bank A.  Based on
the advice of Client V's client advisors at UBS and the
International Bank, the funds were transferred in Swiss francs
so that the transactions would occur entirely in Switzerland.

83.  At or about the time Client V opened his account
at Swiss Bank A, Client Advisor A instructed Client V to use
text messages to communicate with him, rather than telephone
calls, because law enforcement authorities did not yet have the
ability to track the huge volume of text messages that were
written around the world.  In addition, Client Advisor A assured
Client V that his account would remain safe at Swiss Bank A
because the bank was very old, had a rich tradition, and did not
do business in the United States.

84.  In or about June 2009, Client Advisor A met with
Client V in Miami, Florida.

85.  As of on or about October 15, 2009, Client V's
undeclared Swiss Bank A account held approximately $4,175,000.

## Client W

86.  Client Advisor A also opened and managed an undeclared account owned by Client W.  Client W was, at all times relevant to this Indictment, a U.S. citizen and resident of California.

87.  In or about 2008, UBS advised Client W that his undeclared UBS account, which he had inherited from his father in 1999, would be closed.  In or about the following month, Client W asked Swiss Trust Advisor A how he could continue to maintain an undeclared account in Switzerland.  Swiss Trust Advisor A referred Client W to Swiss Bank A and accompanied him to meet Client Advisor A at Swiss Bank A's Zurich Branch.

88.  At this meeting, Client Advisor A interviewed Client W about his personal background, the source of his funds, and the history of his UBS account, among other things.  Client W told Client Advisor A that he was a U.S. citizen living in the United States, showed identification documents to Client Advisor A, and told Client Advisor A that UBS was closing his account.  Client Advisor A told Client W that Swiss Bank A would not have the same problems as UBS because Swiss Bank A did not have business operations in the United States.

89.  Approximately one month later, on or about December 19, 2008, Client W returned to Swiss Bank A's Zurich office, met with Client Advisor A, and opened an account in the

name of Herzen Resources S.A., a sham Panama-registered corporation that Swiss Trust Advisor A had previously sold to Client W. At that time, Swiss Bank A received and thereafter maintained a Form A declaring that Client W, a U.S. citizen and resident of California, was the beneficial owner of the Herzen Resources account. In addition, Swiss Bank A promised not to send mail to Client W in the United States.

90. In or about the summer of 2009, Client Advisor A told Client W that Swiss Bank A had stopped opening new accounts for U.S. clients, and that Client W was lucky that he had been able to open the account.

91. As of on or about September 30, 2009, Client W's undeclared account at Swiss Bank A held approximately $8,685,502.

### Statutory Allegations

92. From at least in or about 2005 up through and including in or about 2010, in the Southern District of New York and elsewhere, MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, together with others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to defraud the United States of America and an agency thereof, to wit, the IRS, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7206(1) and 7201.

93.   It was a part and an object of the conspiracy that MICHAEL BERLINKA, URS FREI, ROGER KELLER, together with others known and unknown, willfully and knowingly would and did defraud the United States of America and the IRS for the purpose of impeding, impairing, obstructing, and defeating the lawful governmental functions of the IRS in the ascertainment, computation, assessment, and collection of revenue, to wit, federal income taxes.

94.   It was further a part and an object of the conspiracy that various U.S. taxpayer-clients of MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, together with others known and unknown, willfully and knowingly would and did make and subscribe returns, statements, and other documents, which contained and were verified by written declarations that they were made under the penalties of perjury, and which these U.S. taxpayer-clients, together with others known and unknown, did not believe to be true and correct as to every material matter, in violation of Title 26, United States Code, Section 7206(1).

95.   It was further a part and an object of the conspiracy that MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, together with others known and unknown, willfully and knowingly would and did attempt to evade and defeat a substantial part of the income tax due and owing to the

United States of America by certain of Swiss Bank A's U.S. taxpayer clients, in violation of Title 26, United States Code, Section 7201.

## Overt Acts

96. In furtherance of the conspiracy and to effect the illegal objects thereof, MICHAEL BERLINKA, URS FREI, ROGER KELLER, the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. On or about September 19, 2008, BERLINKA opened a new undeclared Swiss Bank A account in the name of Client A for the purpose of helping Client A hide assets and income from the IRS.

b. On or about November 25, 2008; January 5, 2009; February 26, 2009; April 21, 2009; and August 25, 2009, BERLINKA caused Swiss Bank A to send by Federal Express multiple checks in the amount of $8,500 to Client A in the United States.

c. In or about October 2008, BERLINKA opened a new undeclared Swiss Bank A account in the name of Clients B and C for the purpose of helping Clients B and C hide assets and income from the IRS.

d. On or about November 4, 2008, KELLER opened a new undeclared Swiss Bank A account in the name of Client P's

son, who was a resident of Manhattan, for the purpose of helping Client P hide assets and income from the IRS.

e.  On or about January 5, 2009, KELLER opened a new undeclared Swiss Bank A account in the name of Client Q's son, for the purpose of helping Client Q hide assets and income from the IRS.

f.  On or about November 13, 2008, FREI opened a new undeclared Swiss Bank A account for Clients H and I for the purpose of helping them hide assets and income from the IRS.

g.  On or about January 12, 2009, FREI opened two new undeclared Swiss Bank A accounts for Clients L and M for the purpose of helping them hide assets and income from the IRS.

h.  In or about 2008, Kenneth Heller, a U.S. taxpayer who lived and worked in Manhattan, opened a new undeclared account at Swiss Bank A for the purpose of hiding income and assets from the IRS.  Heller then transferred approximately $19 million from UBS to Swiss Bank A.

i.  In or about October 2008, in response to a fax and a letter sent by one of Heller's employees to Swiss Bank A, Swiss Bank A wired approximately $50,000 to an account that Heller controlled in the United States.

   j. On various occasions in or about 2008 and 2009, in response to telephone and fax requests that Heller made from locations in Manhattan and New Jersey to the Liechtenstein Asset Manager who managed Heller's account at Swiss Bank A, the Liechtenstein Asset Manager mailed or sent by courier service from Liechtenstein to the United States checks drawn on Swiss Bank A's Stamford Correspondent Account for the benefit of Heller, his wife, and his associates.  For example, on or about July 8, 2009, Heller caused Swiss Bank A to issue from the Stamford Correspondent Account approximately 12 checks in the amount of $2,500 for the benefit of Heller's wife.  The Liechtenstein Asset Manager then sent these checks to Heller in the United States.

   (Title 18, United States Code, Section 371.)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

MICHAEL BERLINKA,
URS FREI, and
ROGER KELLER

Defendants.

### INDICTMENT

12 Cr. _____  (_____)

(Title 18, United States Code,
Section 371.)

_____
PREET BHARARA
United States Attorney.

A TRUE BILL

_____
Foreperson.

1/3/11  Indictment filed. Arrest warrants issued.
Case assigned to Judge Rakoff.

Pitman, MJ