# ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | INDICTMENT |
| -v.- | : | S1 12 Cr. 02 (JSR) |
| WEGELIN & CO.,<br>MICHAEL BERLINKA,<br>URS FREI, and<br>ROGER KELLER, | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - -x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  FEB 02
```

## COUNT ONE
### (Conspiracy)

The Grand Jury charges:

### The Defendants and Co-Conspirators

1.    At all times relevant to this Indictment, WEGELIN & CO. ("WEGELIN"), the defendant, founded in 1741, was Switzerland's oldest bank. WEGELIN provided private banking, asset management, and other services to individuals and entities around the world, including U.S. taxpayers living in the Southern District of New York. WEGELIN provided these services principally through "client advisors" based in its various branches in Switzerland ("Client Advisors"). WEGELIN was principally owned by eight managing partners (the "Managing Partners") and was governed by an executive committee that included the Managing Partners (the "Executive Committee").

WEGELIN had no branches outside Switzerland, but it directly accessed the U.S. banking system through a correspondent account that it held at UBS AG ("UBS") in Stamford, Connecticut (the "Stamford Correspondent Account").  As of in or about December 2010, WEGELIN had 12 branches in Switzerland and approximately $25 billion in assets under management.

2.    From at least in or about 2008 up through and including in or about 2010, MICHAEL BERLINKA, the defendant, was a Client Advisor at the Zurich branch of WEGELIN, the defendant (the "Zurich Branch").

3.    From at least in or about 2006 up through and including in or about 2010, URS FREI, the defendant, was a Client Advisor at the Zurich Branch of WEGELIN, the defendant.

4.    From at least in or about 2007 up through and including in or about 2010, ROGER KELLER, the defendant, was a Client Advisor at the Zurich Branch of WEGELIN, the defendant.

5.    From in or about 2005 up through and including in or about 2010, Client Advisor A, a co-conspirator not named as a defendant herein, was a Client Advisor at the Zurich Branch.  At various times, Client Advisor A also served as the "team leader" of MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, and certain other Client Advisors of the Zurich Branch.  As a

team leader, Client Advisor A coordinated certain activities of, but did not supervise, these and other Client Advisors.

6.    From in or about 2007 up through and including in or about 2012, Managing Partner A, a co-conspirator not named as a defendant herein, was one of the Managing Partners of WEGELIN, the defendant.  From in or about 2005 up through and including in or about 2011, Managing Partner A was the head of WEGELIN'S Zurich Branch.  During that period, Managing Partner A supervised MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, Client Advisor A, and other Client Advisors in the Zurich Branch with respect to, among other things, the opening and servicing of "undeclared accounts" for U.S. taxpayers. "Undeclared accounts" are bank and securities accounts owned by U.S. taxpayers whose assets, and the income generated by the assets, were not reported by the U.S. taxpayers to the taxation authority of the United States, the Internal Revenue Service ("IRS").

7.    From in or about 2008 up through and including in or about 2011, Executive A, a co-conspirator not named as a defendant herein, was a member of the Executive Committee of WEGELIN, the defendant, and worked primarily at the Zurich Branch.

8.   At all times relevant to this Indictment, Beda Singenberger ("Singenberger"), a co-conspirator not named as a defendant herein, was an independent asset manager for various U.S. taxpayers who held undeclared accounts at WEGELIN, the defendant, UBS, Swiss Bank A, and other Swiss banks. Singenberger helped his U.S. taxpayer-clients, WEGELIN, UBS, Swiss Bank A and other Swiss banks hide such accounts, and the income generated therein, by, among other things, selling sham corporations and foundations to U.S. taxpayers as vehicles through which the U.S. taxpayers could hold their undeclared accounts, and by managing the assets held in such accounts. From at least in or about 2002 to in or about 2006, Singenberger regularly traveled to the Southern District of New York and other places in the United States to meet with his U.S. taxpayer-clients with undeclared accounts at WEGELIN, UBS, and other Swiss banks.

9.   From in or about the mid-1990s up through and including in or about late 2008, Gian Gisler ("Gisler"), a co-conspirator not named as a defendant herein, was a client advisor at UBS in Switzerland.  From in or about early 2009 up through and including in or about mid to late 2009, Gisler was an independent asset manager for U.S. taxpayers holding

4

undeclared accounts at WEGELIN, the defendant, UBS, and other Swiss banks.

## Obligations of United States Taxpayers
## With Respect to Foreign Financial Accounts

10.  At all times relevant to this Indictment, citizens and residents of the United States who had income in any one calendar year in excess of a threshold amount ("U.S. taxpayers") were required to file a U.S. Individual Income Tax Return ("Form 1040"), for that calendar year with the IRS.  On Form 1040, U.S. taxpayers were obligated to report their worldwide income, including income earned in foreign bank accounts.  In addition, when a U.S. taxpayer completed Schedule B of Form 1040, he or she was required to indicate whether, at any time during the relevant year, the filer had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account."  If so, the U.S. taxpayer was required to name the country.

11.  In addition, U.S. taxpayers who had a financial interest in, or signature or other authority over, a foreign bank account with an aggregate value of more than $10,000 at any time during a given calendar year were required to file with the IRS a Report of Foreign Bank and Financial Accounts, Form TD F

90-22.1 ("FBAR") on or before June 30 of the following year.  In general, the FBAR required that the U.S. taxpayer identify the financial institution where the account was held, the type of account, the account number, and the maximum value of the account during the relevant calendar year.

### Overview of the Conspiracy

12.   From at least in or about 2002 up through and including in or about 2011, more than 100 U.S. taxpayers conspired with, at various times, WEGELIN, MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, Managing Partner A, Client Advisor A, other Client Advisors at WEGELIN, Beda Singenberger, Gian Gisler, and others known and unknown, to defraud the United States by concealing from the IRS undeclared accounts owned by U.S. taxpayers at WEGELIN.  As of in or about 2010, the total value of undeclared accounts held by U.S. taxpayers at WEGELIN was at least $1.2 billion.

13.   Among other things, WEGELIN, MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, and other Client Advisors opened dozens of new undeclared accounts for U.S. taxpayers in or about 2008 and 2009 after UBS and another large international bank based in Switzerland ("Swiss Bank B") closed their respective businesses servicing undeclared accounts for U.S. taxpayers (the "U.S. cross-border banking businesses") in

the wake of widespread news reports in Switzerland and the
United States that the IRS was investigating UBS for helping
U.S. taxpayers evade taxes and hide assets in Swiss bank
accounts.  WEGELIN, BERLINKA, FREI, KELLER, Client Advisor A and
other Client Advisors did so after WEGELIN's Executive Committee
affirmatively decided to capture for WEGELIN the illegal U.S.
cross-border banking business lost by UBS and deliberately set
out to open new undeclared accounts for U.S. taxpayer-clients
leaving UBS.  At or about the time this policy decision was
announced to team leaders within WEGELIN, Executive A told the
team leaders that WEGELIN was not exposed to the risk of
prosecution that UBS faced in the United States because WEGELIN
was smaller than UBS, and that WEGELIN could charge high fees to
its new U.S. taxpayer-clients because the clients were afraid of
criminal prosecution in the United States.  As a result of this
influx of former UBS U.S. taxpayer-clients into WEGELIN,
WEGELIN's undeclared U.S. taxpayer assets under management, and
the fees earned by managing those assets, increased
substantially.

14.  As part of their sales pitch to U.S. taxpayer-clients
who were fleeing UBS, at various times, BERLINKA, FREI, KELLER,
and other Client Advisors told U.S. taxpayer-clients, in
substance, that their undeclared accounts at WEGELIN would not

7

be disclosed to the United States authorities because WEGELIN had a long tradition of bank secrecy and, unlike UBS, did not have offices outside Switzerland, thereby making WEGELIN less vulnerable to United States law enforcement pressure.  Managing Partner A and Executive A participated in some of the meetings where such statements were made to U.S. taxpayers.

15.    In furtherance of the conspiracy to defraud the United States, WEGELIN, the defendant, helped certain U.S. taxpayer-clients repatriate undeclared funds to the United States by issuing checks drawn on, and executing wire transfers through, WEGELIN'S Stamford Correspondent Account for the benefit of the U.S. taxpayer-clients.  In addition, WEGELIN helped at least two other Swiss banks repatriate undeclared funds to their own U.S. taxpayer-clients by issuing checks drawn on WEGELIN's Stamford Correspondent Account for the benefit of the clients of the two other Swiss banks.

## Means and Methods of the Conspiracy

16. Among the means and methods by which WEGELIN, MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, and their co-conspirators carried out the conspiracy were the following:

a.    WEGELIN, BERLINKA, FREI, and KELLER opened and serviced undeclared accounts for U.S. taxpayers -- sometimes in the name of sham corporations and foundations established under

the laws of Panama, Hong Kong, and Liechtenstein -- for the
purpose of helping the U.S. taxpayers hide assets and income
from the IRS.

      b.    WEGELIN and FREI knowingly accepted bank
documents falsely declaring that such sham entities beneficially
owned certain accounts, when WEGELIN and FREI knew that U.S.
taxpayers beneficially owned such accounts.

      c.    WEGELIN, BERLINKA, and FREI opened undeclared
accounts for U.S. taxpayers using code names and numbers (so-
called "numbered accounts") so that the U.S. taxpayers' names
would appear on as few documents as possible in the event that
the documents fell into the hands of third parties.

      d.    WEGELIN, BERLINKA, FREI, and KELLER ensured that
account statements and related documents were not mailed to
their U.S. taxpayer-clients in the United States.

      e.    WEGELIN, BERLINKA, and KELLER sent e-mails and
Federal Express packages to potential U.S. taxpayer-clients in
the United States to solicit new private banking and asset
management business.

      f.    At various times from in or about 2005 up through
and including in or about 2007, WEGELIN, BERLINKA, FREI, and
KELLER communicated by e-mail and/or telephone with U.S.
taxpayer-clients who had undeclared accounts at WEGELIN.  Client

Advisors sometimes used their personal e-mail accounts to communicate with U.S. taxpayers to reduce the risk of detection by United States law enforcement authorities.

g.   Beginning in or about late 2008 or early 2009, and after WEGELIN began to open new undeclared accounts for U.S. taxpayers fleeing UBS, Managing Partner A instructed BERLINKA, FREI, KELLER and other Client Advisors of the Zurich Branch not to communicate with their U.S. taxpayer-clients by telephone or e-mail, but rather to cause their U.S. taxpayer-clients to travel from the United States to Switzerland to conduct business relating to their undeclared accounts.

h.   Various U.S. taxpayer-clients of WEGELIN, BERLINKA, FREI, and KELLER filed Forms 1040 that falsely and fraudulently failed to report the existence of, and the income generated from, their undeclared WEGELIN accounts; evaded substantial income taxes due and owing to the IRS; and failed to file timely FBARs identifying their undeclared accounts.

i.   Upon request, WEGELIN issued checks drawn on, and executed wire transfers through, the Stamford Correspondent Account for the benefit of U.S. taxpayers with undeclared accounts at WEGELIN and at least two other Swiss banks.  When doing so, WEGELIN sometimes separated the transactions into batches of checks or multiple wire transfers of $10,000 or less

10

to reduce the risk that the IRS would detect the undeclared accounts.

       j.   To further conceal the nature of these transactions, WEGELIN comingled the funds transferred in this fashion with millions of dollars of additional funds that WEGELIN moved through the Stamford Correspondent Account.

## WEGELIN Solicited New Undeclared Accounts Through a Third-Party Website

    17.  From in or about 2005 up through and including in or about 2009, WEGELIN, the defendant, solicited new business from U.S. taxpayers wishing to open undeclared accounts in Switzerland by recruiting clients through the website "SwissPrivateBank.com," which was operated by a third party independent of WEGELIN (the "Website Operator"). As of on or about July 2, 2007, this website advertised "Swiss Numbered Bank Account[s]" and "Swiss Anonymous Bank Account[s]." Specifically, the website stated:

> Swiss banking laws are very strict and it is illegal for a banker to reveal the personal details of an account number unless ordered to do so by a judge.
>
> This is long established in Swiss law. Any banker who reveals information about you without your consent risks a custodial sent[e]nce if convicted, with the only exceptions to this rule concerning serious violent crimes.
>
> Swiss banking secrecy is not lifted for tax evasion. The reason for this is because failure to report

11

> income or assets is not considered a crime under Swiss
> banking law. As such, neither the Swiss government,
> nor any other government, can obtain information about
> your bank account. They must first convince a Swiss
> judge that you have committed a serious crime
> punishable by the Swiss Penal Code.

The website invited users to "[r]equest a Swiss banking consultation today" by clicking a link to a "Consultation Request" form that asked for information about a user's country of residence, telephone number, and e-mail address.  The Website Operator provided this information to WEGELIN Client Advisors, who then sent e-mails to the United States promoting WEGELIN'S private banking and asset management services.  In some cases, Client Advisors sent WEGELIN's promotional materials to U.S. taxpayers in the United States by Federal Express.  Through this website, over time, WEGELIN obtained new undeclared accounts holding millions of dollars in total for U.S. taxpayers. Managing Partner A and other managing partners of WEGELIN received quarterly updates on the progress of this advertising program.  Managing Partner A approved payments to the Website Operator.

### WEGELIN Opens New Undeclared Accounts For U.S. Taxpayers Fleeing UBS

18.  In or about May and June 2008, the IRS's criminal investigation of UBS's U.S. cross-border banking business received widespread media coverage in Switzerland and the United

States.  At or about that time, many U.S. taxpayers with
undeclared accounts at UBS understood that the investigation
might result in the disclosure of their identities and UBS
account information to the IRS.

19.  On or about July 17, 2008, UBS announced that it was
closing its U.S. cross-border banking business.  Thereafter, UBS
client advisors began to notify their U.S. taxpayer-clients that
UBS was closing their undeclared accounts.  Some UBS client
advisors told such clients that they could continue to maintain
undeclared accounts at WEGELIN, the defendant, and certain other
Swiss private banks.  At or about that time, it became widely
known in Swiss private banking circles that WEGELIN was opening
new undeclared accounts for U.S. taxpayers.

20.  In or about 2008, the Executive Committee of WEGELIN,
the defendant, including its Managing Partners, affirmatively
decided to capture the illegal U.S. cross-border banking
business lost by UBS by opening new undeclared accounts for U.S.
taxpayer-clients fleeing UBS.  In or about 2008, Managing
Partner A announced this decision to Client Advisor A and other
team leaders of the Zurich Branch.  At or about the time of this
announcement, Executive A told the team leaders that WEGELIN was
not exposed to the risk of prosecution that UBS faced because
WEGELIN was smaller than UBS, and that WEGELIN could charge high

fees to its new U.S. taxpayer-clients because the clients were afraid of criminal prosecution in the United States.

21. At or about that time, Managing Partner A supervised the creation of a list of Client Advisors at the Zurich Branch who were available to meet with potential U.S. taxpayer-clients, many of whom walked into the Zurich Branch of WEGELIN, the defendant, seeking to open new undeclared accounts. Thereafter, in or about 2008 and 2009, MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, and other Client Advisors met with at least 70 such potential clients. In these meetings, BERLINKA, FREI, KELLER and other Client Advisors interviewed the potential U.S. taxpayer-clients about their backgrounds, the sources of their funds, and the amount of money they wished to transfer from UBS to WEGELIN, among other things. During these meetings, the U.S. taxpayers typically showed their U.S. passports, advised that they were U.S. citizens or legal permanent residents, confirmed that UBS was closing their accounts, and completed certain account opening documents. These documents typically included a standard Swiss banking form called "Form A," which clearly identified the U.S. taxpayers as the beneficial owners of the accounts. In some cases, as described in more detail below, the Client Advisors sought to reassure their new U.S. taxpayer-clients that WEGELIN would not disclose

their identities or account information to the IRS.  In many cases, Managing Partner A or Executive A joined these meetings.

22.   In preparation for these meetings, Managing Partner A and Executive A supervised videotaped training sessions with Client Advisors of the Zurich Branch to instruct them on their delivery of certain selling points to be made to U.S. taxpayers fleeing UBS.  These selling points included the fact that WEGELIN, the defendant, had no branches outside Switzerland and was small, discreet, and, unlike UBS, not in the media.

23.   In this manner, WEGELIN, the defendant, opened new undeclared accounts for at least 70 U.S. taxpayers who had fled UBS in or about 2008 and 2009.  Most were opened at WEGELIN'S Zurich Branch.  When these new undeclared accounts were opened at the Zurich Branch, they were designated with a special code -- "BNQ" -- indicating internally within WEGELIN, among other things, that the accounts were undeclared.  At some point in or about 2008 or 2009, the Zurich Branch required that the opening of all new U.S. taxpayer accounts be approved by Managing Partner A or Executive A.

24.   From in or about March 2009 up through and including in or about October 2009, pursuant to a special IRS program for U.S. taxpayers with undeclared accounts (the "Offshore Voluntary Disclosure Program"), approximately 14,000 U.S. taxpayers

15

voluntarily disclosed to the IRS undeclared accounts held at banks around the world, including WEGELIN, the defendant.  As part of this process, dozens of U.S. taxpayers obtained copies of their WEGELIN bank records.  Some of these records included the names of MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, and other Client Advisors.  In response to the expected disclosure of Client Advisors' names to the IRS through the voluntary disclosure program, in or about 2009, Managing Partner A announced to team leaders of the Zurich Branch that Client Advisors' names would no longer appear on certain WEGELIN records.  From at least in or about late 2009 up through and including in or about early 2010, Client Advisors' names were replaced by "Team International," or a similar designation, on certain WEGELIN records, so as to reduce the risk that Client Advisors' names would become known to the IRS.

    25.  In or about mid-2009, the Executive Committee of WEGELIN, the defendant, decided that the bank would stop opening new undeclared accounts for U.S. taxpayers, but that WEGELIN would continue to service its existing undeclared U.S. taxpayer accounts.  Nevertheless, in or about late 2009 or early 2010, WEGELIN and MICHAEL BERLINKA, the defendant, and Executive A opened at least three new undeclared accounts for U.S. taxpayers who had fled from Swiss Bank A when it, like UBS and Swiss Bank

B, closed its U.S. cross-border banking business for both new and existing U.S. taxpayer-clients. Each of the three new U.S. taxpayer-clients had at least two passports: one from the United States and one from a second country. In each case, WEGELIN, BERLINKA and Executive A opened the new undeclared account under the passport of the second country, even though WEGELIN, BERLINKA and Executive A well knew that the U.S. taxpayer had a U.S. passport.

26. After the Managing Partners of WEGELIN, the defendant, decided to capture UBS's illegal business for themselves, the total value of undeclared accounts held by U.S. taxpayers at WEGELIN, the defendant, increased substantially over time. As of in or about 2005, WEGELIN, the defendant, hid at least $240 million in undeclared U.S. taxpayer assets from the IRS. By in or about 2010, this amount had risen to at least $1.2 billion.

## New Undeclared Accounts Opened by WEGELIN and MICHAEL BERLINKA

27. In or about 2008 and 2009, WEGELIN and MICHAEL BERLINKA, the defendants, opened new undeclared accounts for numerous U.S. taxpayers fleeing UBS, including the following:

### Client A

28. At all times relevant to this Indictment, Client A, a co-conspirator not named as a defendant herein, lived with her husband in Boca Raton, Florida. She became a U.S. citizen in

2003.  In or about 1987, Client A became the beneficial owner of an undeclared account at UBS and its predecessor bank.  In or about July 2008, Client A's UBS client advisor, Gian Gisler, advised Client A and her husband that she must close her UBS account because she was American.  At or about that time, Gisler instructed Client A and her husband not to call UBS from the United States, and told them that he was leaving UBS.  Gisler invited Client A to move her account with Gisler to another bank, but she declined.  Gisler then recommended WEGELIN, the defendant, and noted that it was a reliable bank that had no offices in the United States.

29.  In or about September 2008, Client A and her husband traveled to Zurich to close her UBS account.  By that time, Gisler had left UBS, and Client A had a new UBS client advisor. The new UBS client advisor instructed them not to call from the United States, promised that UBS would not give their information to the IRS, and recommended WEGELIN, the defendant, as a bank at which to hold Client A's account.

30.  Also during this trip, Client A and her husband walked to WEGELIN, the defendant, and met with MICHAEL BERLINKA, the defendant.  BERLINKA interviewed Client A and her husband about their personal background and the source of their funds, among other things.  Client A and her husband told BERLINKA that they

were U.S. citizens, showed their U.S. passports, and said that they wanted to transfer funds from UBS.  BERLINKA opened a new account beneficially owned by Client A using the code name "N1641" on or about September 19, 2008.  At or about that time, WEGELIN accepted a Form A signed by Client A stating that Client A was the beneficial owner of the account.

31.   In connection with the opening of the account, MICHAEL BERLINKA, the defendant, told Client A and her husband that they would be safe at WEGELIN, the defendant, and that BERLINKA had been instructed not to disclose their account information to United States authorities.  In addition, BERLINKA instructed Client A and her husband not to call or send faxes to WEGELIN from the United States and explained that WEGELIN would not send mail to them in the United States.

32.   On multiple occasions in or about 2008 and 2009, Client A or her husband called BERLINKA from the United States to notify him that they would be traveling to Aruba.  Once in Aruba, Client A or her husband called and/or faxed BERLINKA to request that he send checks to them in the United States.  In response, WEGELIN and BERLINKA sent checks drawn on the Stamford Correspondent Account from Switzerland to Client A in Boca Raton, Florida by private letter carrier.  WEGELIN issued the checks in the amount of $8,500 to help conceal the undeclared

account from the IRS.  WEGELIN also wired funds for the benefit of Client A through the Stamford Correspondent Account to the United States and Aruba.  These checks and wire transfers are set forth in the table accompanying paragraph 137 of this Indictment.

33.  In or about September 2009, Client A and her husband learned that their names and UBS account information might be provided to the IRS in connection with the August 2009 agreement between Switzerland and the United States to disclose UBS bank records relating to approximately 4,450 U.S. taxpayers (hereinafter, the "August 2009 Agreement").  Alarmed by this news, Client A's husband called BERLINKA from the United States. During this call, BERLINKA advised Client A's husband not to make a voluntary disclosure to the IRS and assured him that their WEGELIN account information would not be provided to the IRS.

34.  As of on or about October 8, 2008, Client A's undeclared account at WEGELIN, the defendant, held approximately $2,332,860.

### Clients B and C

35.  WEGELIN and MICHAEL BERLINKA, the defendants, opened and managed an undeclared account for a married couple, Clients B and C, co-conspirators not named as defendants herein.  At all

times relevant to this Indictment, Clients B and C were U.S. citizens and residents of Florida.

36.   In or about 2008, UBS notified Clients B and C that they must close their undeclared UBS account, which they had maintained since in or about the late 1990s.  Client B asked Gisler, his former UBS client adviser, if he knew anyone at WEGELIN, the defendant, who could help them.  Gisler recommended MICHAEL BERLINKA, the defendant, and arranged for Clients B and C to meet BERLINKA at the Zurich Branch in or about October 2008.  At that meeting, Clients B and C showed BERLINKA their U.S. passports, provided their U.S. address, and said that they wanted to transfer approximately $900,000 from UBS to WEGELIN. Managing Partner A joined the meeting and further interviewed Clients B and C.  Thereafter, Managing Partner A approved the opening of a new undeclared account for Clients B and C.

37.   At or about the time this account was opened, WEGELIN, the defendant, accepted a Form A from Clients B and C stating that they resided in Florida and beneficially owned the account. MICHAEL BERLINKA, the defendant, agreed on behalf of WEGELIN that WEGELIN would not send mail to Clients B and C in the United States and that Clients B and C could conduct business with WEGELIN using a code name, "N1677."  Because Client B did not want to use his real name when calling WEGELIN from the

United States, BERLINKA set up the account so that Client B
could use another code name -- "Elvis" -- when he did so.
Thereafter, on one or two occasions, Client B called BERLINKA
from the United States to check his account balance, which
BERLINKA provided to Client B.

   38.   On or about December 31, 2008, the undeclared account
at WEGELIN, the defendant, owned by Clients B and C held
approximately $873,958.

   39.   The following table further describes Clients A, B,
and C and other U.S. taxpayers whose Client Advisor was MICHAEL
BERLINKA, the defendant.  None of these U.S. taxpayers timely
reported their accounts at WEGELIN, the defendant, or the income
earned therein, to the IRS on Form 1040 or the FBAR where they
were required to do so.

| Beneficial Owner(s) | Code Name(s) or Nominee Name(s) in which WEGELIN Account(s) Held | Approx. Dates of UBS Account(s) | Approx. Date WEGELIN Account(s) Opened | Approx. High Value of WEGELIN Accounts |
|---|---|---|---|---|
| Client A | N1641 | 1987-2008 | 09/2008 | $2,544,609 |
| Clients B & C | N1677; Elvis | 1998-2008 | 10/2008 | $873,000 |
| Client D | Limpopo Foundation | 1970s-2008 | 12/2008 | $30,895,000 |
| Client E | Hackate Foundation | 1999-2008 | 12/12/2008 | $1,241,644 |
| Total | | | | $35,554,253 |

## New Undeclared Accounts Opened by WEGELIN and URS FREI

   40.   From in or about 2006 up through and including at
least in or about 2010, URS FREI, the defendant, opened and/or
serviced dozens of undeclared accounts for U.S. taxpayers at

WEGELIN, the defendant.  As of in or about 2006, FREI managed
undeclared accounts for approximately 20 U.S. taxpayers holding
approximately $40 million in assets.  Those figures grew
substantially over the next four years.  By in or about 2010,
FREI managed undeclared accounts for approximately 50 U.S.
taxpayers holding approximately $260 million in assets.  Within
WEGELIN'S Zurich Branch, other Client Advisors frequently sought
FREI's advice concerning their undeclared U.S. taxpayer
accounts, and some Client Advisors transferred such accounts to
him.  In or about 2006 and 2007, FREI traveled several times to
the United States for U.S. taxpayer-client business.  In
particular, in or about August and September 2007, FREI traveled
to New York, New York, and to San Diego, San Francisco, Marina
del Rey, and Santa Monica, California.

       41.  In or about 2008 and 2009, WEGELIN and URS FREI, the
defendants, opened new undeclared accounts for U.S. taxpayers
who had fled UBS, including the following:

### Clients F and G

       42.  URS FREI, the defendant, was the Client Advisor at
WEGELIN, the defendant, for two undeclared accounts maintained
by two brothers ("Clients F and G"), co-conspirators not named
as defendants herein, who were, at all times relevant to this
Indictment, U.S. citizens and residents of Bayside, New York.

43.  In or about August 2008, Clients F and G traveled from New York to Zurich to meet with their client advisor at UBS, where they had owned separate undeclared accounts since in or about the 1960s.  The UBS client advisor informed Clients F and G that they must close their UBS accounts, and that other U.S. taxpayers with undeclared accounts were transferring funds to other Swiss banks, including WEGELIN, the defendant.

44.  Clients F and G then walked to the Zurich Branch of WEGELIN, the defendant, which was near UBS's Zurich office, and asked to open a new account for each of them.  There they met with URS FREI, the defendant.  FREI interviewed Clients F and G and inspected their U.S. passports.  Clients F and G told FREI that they wanted to transfer assets from UBS to WEGELIN.

45.  FREI opened separate undeclared accounts for Clients F and G and assisted with the transfer of their funds from UBS to WEGELIN, the defendant: approximately $3.4 million for Client F and $800,000 for Client G.  In addition, FREI established the accounts in code names ("N1 PULTUSK" and "N1 DREW," respectively) so that their names would appear on a minimal number of records relating to their accounts.

46.  After opening their accounts, FREI gave his business card to Clients F and G and told them to call him if they needed anything.  Thereafter, on multiple occasions in or about 2008

and 2009, Clients F and/or G called FREI from the United States and spoke to FREI or one of his assistants about the status and growth of their accounts at WEGELIN, the defendant.

47.  In or about October 2009, the undeclared accounts owned by Clients F and G at WEGELIN, the defendant, held approximately $3.4 million and $800,000 respectively.

### Clients H and I

48.  URS FREI, the defendant, also served as the client advisor at WEGELIN, the defendant, for an undeclared account maintained jointly by Clients H and I, co-conspirators not named as defendants herein.  At all times relevant to this Indictment, Clients H and I were U.S. citizens and residents of New Jersey.

49.  In or about November 2008, Clients H and I's UBS client advisor notified them that they must close their undeclared UBS account.  Client H asked his UBS client advisor to refer him to another Swiss bank so that Clients H and I could continue to maintain an undeclared account.  The UBS client advisor recommended WEGELIN, the defendant, and two other Swiss banks.

50.  Clients H and I walked to the Zurich Branch of WEGELIN, the defendant, and met with URS FREI, the defendant. FREI told Clients H and I that he handled American accounts for WEGELIN.  FREI interviewed Clients H and I about their personal

background and the amount they wished to deposit.  Clients H and I showed their U.S. passports to FREI and told him that they wanted to transfer approximately $1 million from UBS to WEGELIN.

51.  On or about November 13, 2008, URS FREI, the defendant, opened a new account for Clients H and I.  At that time, WEGELIN, the defendant, promised Clients H and I that they could conduct business with the bank using the code name "N5771."  WEGELIN also promised not to send mail to Clients H and I in the United States.  In addition, FREI instructed Clients H and I not to call him from the United States.  Later, in or about July 2009, FREI lifted this restriction after Clients H and I informed him that they had voluntarily disclosed their WEGELIN account to the IRS.

52.  On or about July 14, 2009, the undeclared account owned by Clients H and I at WEGELIN, the defendant, held approximately $1,105,593.

### Clients J and K

53.  URS FREI, the defendant, also opened an undeclared account at WEGELIN, the defendant, for Clients J and K, a married couple and co-conspirators not named as defendants herein.  At all times relevant to this Indictment, Clients J and K were U.S. citizens living in Los Angeles, California.

54.  In or about 2008, Clients J and K, who had maintained
an undeclared account at UBS and one of its predecessor banks
since in or about the 1980s, were advised by their UBS client
adviser that they must close their undeclared UBS account.
Clients J and K then spoke to an attorney in Los Angeles (the
"Los Angeles Attorney"), who advised them to create an offshore
entity to hold the account and who referred them to WEGELIN and
URS FREI, the defendants.  Thereafter, in or about November
2008, at the Los Angeles Attorney's office, Clients J and K
completed account opening documents for a new account to be held
in the name of White Tower Holdings, LLC, a corporation formed
under the laws of Nevis.  These documents included: (1) a Form A
stating that Clients J and K beneficially owned the White Tower
Holdings account; (2) copies of the U.S. passports of Clients J
and K; (3) a separate WEGELIN form in which Clients J and K
falsely stated that White Tower Holdings was the "beneficial
owner of all income from US sources deposited in the above-
mentioned portfolio(s), in accordance with US tax law[]"; and
(4) even though the account was to be undeclared, Forms W-9 for
Clients J and K.  A Form W-9 is an IRS form through which U.S.
taxpayers can identify themselves as such to a bank, thereby
causing the bank to report the U.S. taxpayers' account income to

the IRS each year on Form 1099.  The Los Angeles Attorney then sent the signed documents from the United States to WEGELIN.

55.  In or about November 2008, Clients J and K traveled to Zurich and Client K met with URS FREI, the defendant, at WEGELIN, the defendant.  FREI advised Client K that mail would not be sent to Clients J and K in the United States.  FREI also advised that ROGER KELLER, the defendant, would be FREI's secondary contact at the bank in the event that FREI was unavailable.  The next day, Clients J and K met with FREI again to discuss the wiring of their funds from UBS to WEGELIN.

56.  On or about September 30, 2009, the undeclared account owned by Clients J and K at WEGELIN, the defendant, held approximately $614,408.

### Clients L and M

57.  URS FREI, the defendant, was also the client advisor for an undeclared account held at WEGELIN, the defendant, by Clients L and M, a married couple and co-conspirators not named as defendants herein.  At all times relevant to this Indictment, Clients L and M were U.S. citizens and residents of Florida.

58.  In or about December 2008, the UBS client advisor for Clients L and M notified them that they must close their undeclared UBS account, which they had held in the name of an entity called the Magabri Foundation, a sham entity formed under

the laws of Liechtenstein.  The UBS client advisor further informed Clients L and M that they could open a new account at WEGELIN, the defendant.  The UBS client advisor spoke to URS FREI, the defendant, on behalf of Clients L and M and learned that WEGELIN and FREI were willing to open a new account for them in the name of their sham entity, the Magabri Foundation.

59.  The UBS client advisor then arranged for, and accompanied Clients L and M to, a meeting with URS FREI, the defendant, at the Zurich Branch of WEGELIN, the defendant, in or about January 2009.  At or about that time, FREI was informed that Clients L and M were U.S. citizens living in Florida and that UBS was closing their account.

60.  On or about January 12, 2009, WEGELIN and URS FREI, the defendants, opened two new undeclared accounts for Clients L and M in the name of the Magabri Foundation.  At or about that time, WEGELIN, the defendant, accepted a Form A declaring that Clients L and M were the beneficial owners of the accounts. Copies of their passports were attached to the Form A.  In addition, WEGELIN promised not to send mail to Clients L and M in the United States, and FREI instructed Client L not to call him from the United States.  FREI lifted the instruction not to call from the United States in or about November 2009 after

Client L notified FREI that he had voluntarily disclosed the
Magabri Foundation accounts to the IRS.

61.   On or about December 31, 2009, the undeclared accounts
owned by Clients L and M at WEGELIN, the defendant, held
approximately $2,729,318.

62.   Several of the undeclared U.S. taxpayer-clients of
WEGELIN and URS FREI, the defendants, are described in the
following table.   None of these U.S. taxpayers timely reported
their WEGELIN accounts, or the income earned therein, to the IRS
on Form 1040 or the FBAR where they were required to do so.

| Beneficial Owner(s) | Code Name(s) or Nominee Name(s) in which WEGELIN Account(s) Held | Approximate Dates of UBS Account(s) | Approximate Date WEGELIN Account(s) Opened | Approximate High Value of WEGELIN Accounts |
|---|---|---|---|---|
| Client F | N1 PULTUSK | 1960s - 2008 | 08/2008 | $3,200,000 |
| Client G | N1 DREW | 1960s - 2008 | 08/2008 | $800,000 |
| Clients H and I | N5571 | 2006 - 2008 | 11/13/2008 | $1,105,593 |
| Clients J and K | White Tower Hold. | 1980s - 2008 | 11/6/2008 | $614,408 |
| Clients L and M | Magabri Foundation | 1997 - 2009 | 1/12/2009 | $2,729,318 |
| Clients N and O | Efraim Foundation | 1973 - 2008 | 06/2008 | $52,747,000 |
| Arthur Eisenberg | N1126 | 1983 - 2008 | 12/10/2008 | $2,234,608 |
| Total | | | | $60,980,927 |

## New Undeclared Accounts Opened by WEGELIN and ROGER KELLER

63.   From in or about 2007 up through and including at
least in or about 2010, WEGELIN and ROGER KELLER, the
defendants, opened and serviced undeclared accounts for dozens
of U.S. taxpayers.   By in or about the end of 2008, KELLER

managed undeclared accounts for at least 30 U.S. taxpayers holding approximately $120 million in total.

64.   In or about 2008 and 2009, WEGELIN and ROGER KELLER, the defendants, opened new undeclared accounts for U.S. taxpayers leaving UBS, including the following:

### Client P

65.   ROGER KELLER, the defendant, served as the client advisor for an undeclared account maintained by Client P, a co-conspirator not named as a defendant herein, at WEGELIN, the defendant.  At all times relevant to this Indictment, Client P was a U.S. citizen and resident of Maryland.

66.   In or about 2008, UBS advised Client P that he must close his undeclared UBS account, which he had maintained since in or about 1970.  Because Client P's deteriorating health did not permit him to travel to Switzerland, Client P's son, a co-conspirator not named as a defendant herein, traveled to Zurich in or about November 2008 to close Client P's UBS account and identify another Swiss private bank that would open a new undeclared account for Client P.  The UBS client advisor referred Client P's son to WEGELIN, the defendant, and two other Swiss banks.

67.   On or about November 3, 2008, Client P's son walked into the Zurich Branch of WEGELIN, the defendant, without an

31

appointment and asked to open an account.  ROGER KELLER, the

defendant, interviewed Client P's son.  Client P's son told

KELLER that he and Client P were U.S. citizens who lived in the

United States and that Client P had maintained an account for

many years at UBS.

68.  On or about the following day, November 4, 2008, ROGER

KELLER, the defendant, with the approval of Managing Partner A,

opened a new undeclared account in the name of Client P's son.

At or about that time, WEGELIN, the defendant, accepted a Form A

falsely stating that Client P's son, who lived in Manhattan, was

the sole beneficial owner of the account.  WEGELIN promised not

to send account statements or other mail relating to the account

to the United States.

69.  On or about September 30, 2009, Client P's undeclared

account at WEGELIN, the defendant, held approximately $732,938.

### Client Q

70.  ROGER KELLER, the defendant, was also the client

advisor for an undeclared account owned by Client Q, a co-

conspirator not named as a defendant herein, at WEGELIN, the

defendant.  At all times relevant to this Indictment, Client Q

was a U.S. citizen and resident of California.

71.  In or about December 2008, Client Q's UBS client

advisor informed him that he must close his undeclared UBS

account, which he had owned since in or about 1987. Thereafter, Client Q's previous UBS client advisor told him that WEGELIN, the defendant, was willing to open new undeclared accounts for U.S. taxpayers.

72.  In or about January 2009, because Client Q was unable for health reasons to travel to Zurich to close his UBS account, Client Q's son, a co-conspirator not named as a defendant herein, traveled in his place. Client Q's previous UBS client advisor set up an appointment at WEGELIN, the defendant, and accompanied Client Q's son to meet with ROGER KELLER, the defendant, and a Zurich Branch supervisor on or about January 5, 2009. At this initial meeting, KELLER and the supervisor interviewed Client Q's son about his personal background, the source of the funds, and the amount that he wished to deposit, among other things. Client Q's son told KELLER and the supervisor that he was a U.S. citizen and that he wanted to transfer approximately $7 million from UBS to WEGELIN.

73.  Later that day, ROGER KELLER, the defendant, advised Client Q's son by telephone that WEGELIN, the defendant, would open an account for him. Client Q's son then returned to the bank and completed various paperwork. At or about that time, KELLER asked Client Q's son whether he wanted to complete an IRS Form W-9, which, if completed, would cause WEGELIN to file a

Form 1099 with the IRS to report the income in Client Q's account in a given year. Client Q's son told KELLER that he did not wish to complete the Form W-9. In addition, KELLER agreed that WEGELIN would not send mail relating to the account to the United States. In the context of a conversation about the demise of UBS's cross-border banking business, and KELLER told Client Q's son that WEGELIN was the oldest bank in Switzerland. KELLER did so to assure him that WEGELIN would not disclose Client Q's identity or account information to the IRS.

74.   In or about September 2009, Client Q and his son traveled to Zurich and met with ROGER KELLER, the defendant, and a lawyer representing WEGELIN, the defendant. In the context of a discussion about the August 2009 Agreement that would result in the disclosure of 4,450 UBS account files to the IRS, KELLER and the WEGELIN lawyer assured Client Q and his son that Client Q's account was safe and that their names would not be released to the United States authorities.

75.   On or about March 31, 2010, Client Q's undeclared account at WEGELIN, the defendant, held approximately $7,173,679.

76.   Client P, Client Q, and other undeclared U.S. taxpayer-clients of WEGELIN and ROGER KELLER, the defendants, are described in the following table. None of these U.S.

taxpayers timely reported their WEGELIN accounts, or the income earned therein, to the IRS on Form 1040 or the FBAR where they were required to do so.

| Beneficial Owner(s) | Code Name(s) or Nominee Name(s) in which WEGELIN Account(s) Held | Approx. Dates of UBS Account(s) | Approx. Date WEGELIN Account(s) Opened | Approximate High Value of WEGELIN Accounts |
|---|---|---|---|---|
| Client P | Client P's Son | 1970-2008 | 2008 | $732,938 |
| Client Q | Client Q's Son | 1987-2009 | 1/5/2009 | $7,173,679 |
| Clients R & S | Client R's Advisor | 1970s | 12/19/2008 | $3,667,724 |
| Clients T & U | TMT Family Foundation | 1981-2008 | 11/2008 | $1,247,649 |
| Total | | | | $12,821,990 |

## New Undeclared Accounts Opened by Client Advisor A

77.   From in or about 2005 up through and including in or about 2010, Client Advisor A opened and serviced U.S. taxpayer-clients with undeclared accounts at WEGELIN, the defendant, including the following:

### Client V

78.   For example, Client Advisor A opened and maintained an undeclared account for Client V, a co-conspirator not named as a defendant herein, at WEGELIN, the defendant.   Client V was, at all times relevant to this Indictment, a U.S. citizen and resident of Florida.

79.   Beginning in or about 2005, Client V owned undeclared accounts at UBS and Swiss Bank B.   In or about 2008 and 2009, both UBS and Swiss Bank B required Client V to close his undeclared accounts.

35

80.  On or about April 14, 2009, Client V's client advisor
at Swiss Bank B informed Client V that WEGELIN, the defendant,
was opening new undeclared accounts for U.S. taxpayers who were
fleeing Swiss Bank B.  Client V then walked to the Zurich Branch
of WEGELIN, the defendant, without an appointment and asked to
open an account.

81.  At or about that time, Client Advisor A interviewed
Client V about his personal background and the source of his
funds, among other things.  Client V told Client Advisor A that
UBS and Swiss Bank B were closing his accounts; showed Client
Advisor A his U.S. passport; and told Client Advisor A that he
wished to deposit approximately $5.7 million at WEGELIN, the
defendant.  Client Advisor A, with the express approval of
Managing Partner A, agreed to open the account through a
"structure" -- that is, a sham offshore entity -- rather than in
Client V's own name.

82.  To establish the "structure," on or about that same
day, April 14, 2009, Client Advisor A invited an employee of a
Swiss company that provides tax and legal services ("Swiss Trust
Advisor A") to meet with Client V.  At that meeting, Swiss Trust
Advisor A sold to Client V an off-the-shelf sham entity called
the Nitro Foundation.  Client Advisor A, in turn, opened a new
account at WEGELIN, the defendant, for Client V in the name of

36

the Nitro Foundation.  In written materials that Swiss Trust
Advisor A provided to WEGELIN, Swiss Trust Advisor A
acknowledged that Client V's account would be undeclared.  At or
about that time, WEGELIN accepted a Form A declaring that Client
V, a U.S. citizen and resident of Florida, was the beneficial
owner of the Nitro Foundation account.  In addition, WEGELIN
promised that it would not send mail to Client V in the United
States.  Thereafter, Client V instructed UBS and the Swiss Bank
B to transfer his funds to the Nitro Foundation account at
WEGELIN.  Based on the advice of Client V's client advisors at
UBS and Swiss Bank B, the funds were transferred in Swiss francs
so that the transactions would occur entirely in Switzerland,
thereby reducing the risk that the IRS would detect the account.

83.  At or about that time, Client Advisor A instructed
Client V to use text messages to communicate with him, rather
than telephone calls, because U.S. law enforcement authorities
did not yet have the ability to track the huge volume of text
messages that were written around the world.  In addition,
Client Advisor A assured Client V that his account would remain
safe at WEGELIN because the bank was very old, had a rich
tradition, and did not do business in the United States.

84.  In or about June 2009, Client Advisor A met with
Client V in Miami, Florida.

85.   On or about October 15, 2009, Client V's undeclared account at WEGELIN, the defendant, held approximately $4,175,000.

### Client W

86.   Client Advisor A also opened an undeclared account for Client W, a co-conspirator not named as a defendant herein. Client W was, at all times relevant to this Indictment, a U.S. citizen who lived in California.

87.   In or about 2008, UBS advised Client W that his undeclared UBS account would be closed.   In or about the following month, Client W asked Swiss Trust Advisor A how he could continue to maintain an undeclared account in Switzerland. Swiss Trust Advisor A referred Client W to WEGELIN, the defendant, and accompanied him to meet Client Advisor A at WEGELIN'S Zurich Branch.

88.   At this meeting, Client Advisor A interviewed Client W about his personal background, the source of his funds, and the history of his UBS account, among other things.   Client W told Client Advisor A that he was a U.S. citizen, showed his passport, and said that UBS was closing his account.   Client Advisor A told Client W that WEGELIN, the defendant, would not have UBS's problems with the IRS because WEGELIN did not have branches in the United States.

38

89.   On or about December 19, 2008, Client W returned to the Zurich office of WEGELIN, the defendant, met with Client Advisor A, and opened an account in the name of Herzen Resources S.A., a sham Panama corporation that Client W had bought from Swiss Trust Advisor A.  At or about that time, WEGELIN accepted a Form A declaring that Client W beneficially owned the Herzen Resources account.  In addition, WEGELIN promised not to send mail to Client W in the United States.

90.   In or about the summer of 2009, Client Advisor A told Client W that WEGELIN, the defendant, had stopped opening new accounts for U.S. clients, and that Client W was lucky that he had been able to open the Herzen Resources account.

91.   On or about September 30, 2009, Client W's undeclared account at WEGELIN, the defendant, held approximately $8,685,502.

## Undeclared WEGELIN Accounts Managed by Independent Asset Managers

92.   Separate and apart from the undeclared accounts that WEGELIN, the defendant, opened and managed directly for U.S. taxpayers through its Client Advisors, WEGELIN also acted as a custodian with respect to undeclared accounts that were managed by independent asset managers, including the following:

### Kenneth Heller

93.   At all times relevant to this Indictment, Kenneth Heller, a co-conspirator not named as a defendant herein, was a U.S. citizen who lived and worked primarily in Manhattan.   In or about December 2005 and January 2006, Heller opened an undeclared account at UBS and funded it with approximately $26,420,822 wired from the United States.

94.   On or about June 6, 2008, Heller became concerned about the IRS's investigation into UBS's cross-border banking business and faxed a news article about the investigation to his UBS client advisor ("UBS Client Advisor A").

95.   On or about June 21, 2008, Heller retained an independent asset manager based in Liechtenstein ("Liechtenstein Asset Manager A") to manage a new undeclared account that Heller opened at WEGELIN, the defendant, at or about that time.   Over the next several months, Heller funded this account with approximately $19 million wired from UBS.   In order to protect Heller, the account was opened in the name of Nathelm Corporation, according to a September 9, 2008 letter sent to Heller's tax preparer by an attorney working for Heller ("Heller Attorney A").   This letter further stated:

> All Heller money was transferred directly from UBS to
> Wegelin. . . . The problem is the US Government
> interference with Swiss Banks, in [an] attempt to

seize income tax evaders. . . . The US Government
gladly pressed its case with Swiss Govt for bank
disclosure of US citizens, etc.  This is why KH left
UBS[.]

96.  On or about August 22, 2008, among other occasions,
Liechtenstein Asset Manager A faxed to Heller's office in
Manhattan account statements and other documents relating to
Heller's undeclared account at WEGELIN, the defendant.

97.  On or about October 2, 2008, Heller Attorney A faxed
instructions from Heller's office in Manhattan to WEGELIN, the
defendant, directing WEGELIN to wire approximately $50,000 to a
U.S. bank account that HELLER controlled.

98.  On various occasions in or about 2008 and 2009, in
response to telephone and fax requests from Heller to
Liechtenstein Asset Manager A, WEGELIN, the defendant, issued
multiple checks drawn on the Stamford Correspondent Account for
the benefit of Heller.  For example, as set forth in the table
accompanying paragraph 137, on or about July 8, 2009, WEGELIN
issued approximately 12 checks for Heller's benefit, each in the
amount of $2,500.  Liechtenstein Asset Manager A sent these
checks to Heller in the United States.

99.  On or about December 31, 2008, Heller's undeclared
account at WEGELIN, the defendant, held approximately
$18,466,686.

## Clients X and Y

100. Beda Singenberger served as the independent asset manager for numerous U.S. taxpayers holding undeclared accounts at WEGELIN, the defendant, including Clients X and Y, co-conspirators not named as defendants herein.  At all times relevant to this Indictment, Clients X and Y, a married couple, were citizens and residents of the United States.

101. On or about April 8, 2002, Singenberger opened an undeclared account at WEGELIN, the defendant, for Clients X and Y in the name of Berry Trust, a sham Liechtenstein foundation. At or about that time, WEGELIN accepted a Form A stating that Clients X and Y beneficially owned the Berry Trust account.  At or about that time, WEGELIN accepted another bank form falsely declaring that Berry Trust beneficially owned the Berry Trust account.  At the top of this false form, the letters "BNQ" were written to ensure that this account was correctly coded in WEGELIN's computer system as an undeclared account.

102. In or about 2003, Singenberger opened a second account for Client X, at WEGELIN, the defendant, this time in the name of Asset Champion, Ltd., a sham Hong Kong corporation.

103. Thereafter, until in or about 2009, Singenberger managed the assets held by Clients X and Y at WEGELIN, the

defendant.  On or about December 31, 2003, the combined value of these undeclared accounts was approximately $6,133,000.

## Client Z

104. Singenberger also managed the assets for an undeclared account that Client Z, a co-conspirator not named as a defendant herein, held at WEGELIN, the defendant.  At all times relevant to this Indictment, Client Z was a U.S. citizen and resident.

105. On or about October 1, 2004, Singenberger opened an account for Client Z at WEGELIN, the defendant, in the name of Eagle Elite Investments, Ltd., a sham Hong Kong corporation.  At or about that time, WEGELIN accepted a Form A stating that Client Z beneficially owned the Eagle Elite Investments account. At or about that time, WEGELIN also accepted another bank form falsely declaring that Eagle Elite Investments beneficially owned the account.

106.  In or about 2009, Client Z held approximately $232,435 in his undeclared account at WEGELIN, the defendant.

107. Several U.S. taxpayer-clients whose undeclared accounts at WEGELIN, the defendant, were managed by independent asset managers are described in the following table.  These U.S. taxpayers did not timely report their accounts at WEGELIN (or the income earned therein), to the IRS on Form 1040 or the FBAR where they were required to do so.

43

| Beneficial Owner(s) | Code Name(s) or Nominee Name(s) in which WEGELIN Account(s) Held | Approx. Date WEGELIN Account(s) Opened | Approx. High Value of WEGELIN Account(s) |
|---|---|---|---|
| Kenneth Heller | Nathelm Corp. | 12/2005 | $18,466,686 |
| Clients X & Y | Berry Trust, Asset Champion Ltd | 4/10/2002 | $6,133,000 |
| Client Z | Eagle Elite Investments Ltd. | 10/1/2004 | $232,435 |
| Client AA | Levina Trust | 4/10/2002 | $776,090 |
| Client BB | N 466 | 2005 | $55,496 |
| Client CC & DD | Nema Trust; Grand Dynamic Invest.; Top Harbour Properties | 2002; 6/23/2003; 6/6/2005 | $4,439,666 |
| Michael Reiss | Floranova Foundation; Upside International | 9/11/2003; 11/2008 | $2,588,470 |
| Total | | | |

## The Repatriation of Undeclared Funds Through the Stamford Correspondent Account

108. From at least in or about 2005 up through and including in or about 2011, WEGELIN, the defendant, used its Stamford Correspondent Account not only to help its own U.S. taxpayer-clients repatriate undeclared funds to the United States without detection by the IRS but also to help U.S. taxpayer-clients of at least two other Swiss banks accomplish the same unlawful ends.  For example:

### Client EE

109. At all times relevant to this Indictment, Client EE, a co-conspirator not named as a defendant herein, was a resident of New Jersey and a citizen of the United States.

110. In or about 2008, Client EE opened an undeclared account at WEGELIN, the defendant, and funded it through a

44

transfer from Swiss Bank B, where he had held an undeclared account since in or about the 1980s.  Client EE's new undeclared account at WEGELIN was managed by an independent asset manager in Switzerland ("Independent Asset Manager A").

111. In or about 2010, Client EE traveled to Africa for a safari.  To pay for the safari, by arrangement with Independent Asset Manager A, Client EE sent a letter with no return address from New Jersey to Independent Asset Manager A in Switzerland. The envelope contained a single piece of paper on which Client EE had written only the amount of money Client EE needed to wire to the safari company, namely, approximately $37,000.  At or about that time, Client EE sent a second and separate letter to Independent Asset Manager A containing only the wire transfer details for the safari company's bank account in Botswana. Thereafter, pursuant to these instructions, on or about June 22, 2010, WEGELIN wired approximately $37,000 through the Stamford Correspondent Account to the safari company's bank account in Botswana.

112. In or about December 2009, Client EE's undeclared account at WEGELIN, the defendant, held approximately $847,844.

45

## Client FF

113. At all times relevant to this Indictment, Client FF, a co-conspirator not named as a defendant herein, was a resident of Connecticut and a citizen of the United States.

114. In or about 2006, Client FF inherited funds held in an undeclared account at WEGELIN, the defendant.

115. On various occasions from in or about 2007 up through and including in or about 2011, WEGELIN wired a total of approximately $324,955 in increments less than $10,000 through the Stamford Correspondent Account to Client FF in the United States, as described in the table accompanying paragraph 137.

116. On or about December 31, 2008, Client FF's undeclared account at WEGELIN, the defendant, held approximately $637,395.

## Client GG

117. At all times relevant to this Indictment, Client GG, a co-conspirator not named as a defendant herein, was a resident of Westchester County, New York, and a citizen of the United States.

118. In or around 2006, Client GG transferred undeclared funds that he had held at a Swiss bank since in or about the early 1990s to a new undeclared account at WEGELIN, the defendant. The new undeclared account was held in the name of Birkdale Universal, S.A., a sham entity established under the

46

laws of Panama (the "Birkdale Account").  Client GG's Client
Advisor was URS FREI, the defendant.  FREI explained to Client
GG that the purpose of placing the assets in the name of
Birkdale was to further conceal Client GG's ownership of the
funds.  Later, when Client GG discussed the U.S. government's
investigation of UBS with FREI, FREI said that because WEGELIN
had no offices outside Switzerland, WEGELIN was less vulnerable
to U.S. law enforcement pressure than UBS.

119.  In addition, Client GG maintained two "declared
accounts" at WEGELIN – that is, accounts that were known to the
IRS because Client GG had submitted a Form W-9 to WEGELIN,
causing WEGELIN to file a Form 1099 with the IRS each year
reporting the income earned in the accounts.

120.  In or about August 2007, WEGELIN and URS FREI, the
defendants, used the Stamford Correspondent Account to conceal
FREI's unlawful hand delivery of approximately $16,000 in U.S.
currency to another FREI U.S. taxpayer-client ("FREI's Other
Client").  On or about August 8 and August 9, 2007, WEGELIN and
FREI used the Stamford Correspondent Account to wire
approximately $16,000 in total from one of Client GG's declared
WEGELIN accounts to Client GG's U.S. bank account in Westchester
County.  The $16,000 transfer was divided into two wires of
$8,000 on back-to-back days to further conceal the transaction.

Thereafter, at FREI's request, Client GG withdrew approximately $16,000 in U.S. currency from his Westchester County account. On or about August 21, 2007, Client GG carried this $16,000 in cash with him to a lunch meeting in Manhattan with FREI, again at FREI's request. At the lunch, Client GG handed FREI an unmarked envelope containing the $16,000. During the lunch, the head waiter informed FREI that someone else at the restaurant wished to speak with him. FREI then excused himself from Client GG, walked to the other side of the restaurant, and met with FREI's Other Client for approximately 10 minutes. At or about that time, FREI gave the Other Client the cash-filled unmarked envelope that Client GG had given to FREI moments earlier. FREI then returned to Client GG and noted that it was becoming increasingly difficult to move funds out of Switzerland, and that, to do so, he employed this technique of transferring cash directly between his clients. Thereafter, FREI credited approximately $16,000 to Client GG's undeclared account at WEGELIN -- the Birkdale Account.

121. In or about 2010, Client GG's undeclared account at WEGELIN, the defendant, held approximately $898,652.

## Client HH

122. At all times relevant to this Indictment, Client HH, a co-conspirator not named as a defendant herein, was a resident of Connecticut and a citizen of the United States.

123. Beginning in or about the 1990s, Client HH maintained an undeclared account at UBS. In or about 2003, Client HH and her Swiss independent asset manager ("Independent Asset Manager B") transferred her UBS funds to an undeclared account at WEGELIN, the defendant.

124. On various occasions from in or about 2003 up through and including in or about 2009, Client HH traveled to Switzerland and withdrew funds from her undeclared account at WEGELIN, the defendant, with the help of Independent Asset Manager B. Independent Asset Manager B advised Client HH not to carry more than $10,000 into the United States at any one time.

125. On various occasions from in or about 2003 up to and including in or about 2009, Independent Asset Manager B met Client HH for dinner in Manhattan. When he did so, he sometimes gave her U.S. currency withdrawn from her undeclared account at WEGELIN, the defendant.

126. On various occasions from in or about 2005 up through and including in or about 2009, WEGELIN, the defendant, issued checks to Client HH drawn on the Stanford Correspondent Account.

As set forth in the table accompanying paragraph 137, WEGELIN issued multiple checks in this manner, each for less than $10,000 to further conceal Client HH's undeclared account, for a total of approximately $79,500.

127. As of December 2007, Client HH's undeclared account at WEGELIN, the defendant, held approximately $177,095.

### Client II

128. At all times relevant to this Indictment, Client II, a co-conspirator not named as a defendant herein, was a resident of Arizona and a citizen of the United States.

129. Beginning in or about 2010, Client II maintained an undeclared account at Swiss Bank C.

130. In or about 2010, Client II asked his client advisor at Swiss Bank C ("Swiss Bank C Client Advisor") to send him several batches of checks at regular intervals, three checks at a time, each for less than $5,000, payable to a company that Client II controlled ("Client II's Company"). Client II further requested that the checks "be drawn in the U.S. dollars on your corresponding US bank" and noted that the checks would be cashed over time.

131. Thereafter, from in or about December 2010 up through and including in or about March 2011, WEGELIN, the defendant, issued approximately five checks drawn on the Stamford

Correspondent Account payable to Client II's Company and provided them to the Swiss Bank C Client Advisor, who, in turn, sent them to Client II in Arizona.  WEGELIN issued the checks, which are set forth in the table accompanying paragraph 137, in amounts less than $5,000, for a total of $21,088.

132. As of in or about October 2010, Client II's undeclared Swiss Bank C account held approximately $2,183,606.

### Client JJ

133. At all times relevant to this Indictment, Client JJ, a co-conspirator not named as a defendant herein, was a resident of Arizona and a citizen of the United States.

134. Beginning in or about the 1990s, Client JJ maintained an undeclared account at Swiss Bank B.  In or about late 2009, Swiss Bank B informed him that he had to close his account.  He then traveled to Switzerland and opened an undeclared account at Swiss Bank C with the help of the Swiss Bank C Client Advisor.

135. Thereafter, from in or about October 2009 up through and including in or about March 2011, WEGELIN issued five checks drawn on the Stamford Correspondent Account payable to Client JJ, each in the amount of approximately $45,000, as set forth in the table accompanying paragraph 137.

136. As of July 2011, Client JJ's undeclared Swiss Bank C account held approximately $6,700,000.

51

137. Certain checks and wire transfers that WEGELIN, the defendant, issued and executed through the Stamford Correspondent Account on behalf of U.S. taxpayers with undeclared accounts at WEGELIN, Swiss Bank C, and Swiss Bank D, for a total of approximately $1,417,626, are listed in the following table.  None of these U.S. taxpayers timely reported such accounts, or the income earned therein, to the IRS on Form 1040 or the FBAR where they were required to do so.

| Check # (or wire) | Check/ Wire date | Approx. amount | Undeclared U.S. taxpayer | Swiss bank where U.S. taxpayer's account was held |
|---|---|---|---|---|
| 2184 | 3/10/2005 | $ 5,621.00 | Client KK | Swiss Bank D |
| 2217 | 4/20/2005 | $ 5,000.00 | Client HH | WEGELIN |
| 2252 | 6/23/2005 | $ 9,367.00 | Client KK | Swiss Bank D |
| 2331 | 10/11/2005 | $ 7,863.00 | Client KK | Swiss Bank D |
| 2399 | 1/9/2006 | $ 32,250.00 | Client KK | Swiss Bank D |
| 2423 | 2/7/2006 | $ 26,675.00 | Client KK | Swiss Bank D |
| 2448 | 3/15/2006 | $ 7,570.00 | Client KK | Swiss Bank D |
| 2490 | 5/16/2006 | $ 8,250.00 | Client KK | Swiss Bank D |
| 2547 | 7/26/2006 | $ 2,900.00 | Client KK | Swiss Bank D |
| 2591 | 9/7/2006 | $ 8,000.00 | Client KK | Swiss Bank D |
| 2634 | 11/7/2006 | $ 9,827.00 | Client KK | Swiss Bank D |
| 2635 | 11/8/2006 | $ 5,000.00 | Client HH | WEGELIN |
| 2636 | 11/13/2006 | $ 5,000.00 | Client HH | WEGELIN |
| 2726 | 2/8/2007 | $ 8,730.00 | Client KK | Swiss Bank D |
| Wire | 3/30/2007 | $ 8,000.00 | Client FF | WEGELIN |
| 2791 | 4/25/2007 | $ 8,200.00 | Client KK | Swiss Bank D |
| Wire | 4/27/2007 | $ 8,000.00 | Client FF | WEGELIN |
| Wire | 8/8/2007 | $ 8,000.00 | Client GG | WEGELIN |
| Wire | 8/9/2007 | $ 8,000.00 | Client GG | WEGELIN |
| 3152 | 11/13/2007 | $ 5,000.00 | Client HH | WEGELIN |
| 3253 | 3/13/2008 | $ 5,000.00 | Client KK | Swiss Bank D |
| Wire | 4/1/2008 | $ 2,000.00 | Client FF | WEGELIN |
| Wire | 4/15/2008 | $ 4,000.00 | Client FF | WEGELIN |
| Wire | 5/1/2008 | $ 2,000.00 | Client FF | WEGELIN |
| Wire | 5/15/2008 | $ 4,000.00 | Client FF | WEGELIN |
| Wire | 5/30/2008 | $ 2,000.00 | Client FF | WEGELIN |
| 3283 | 5/30/2008 | $ 8,500.00 | Client HH | WEGELIN |
| Wire | 6/13/2008 | $ 4,000.00 | Client FF | WEGELIN |
| Wire | 7/1/2008 | $ 2,000.00 | Client FF | WEGELIN |
| Wire | 7/15/2008 | $ 4,000.00 | Client FF | WEGELIN |
| Wire | 8/1/2008 | $ 2,000.00 | Client FF | WEGELIN |

| Check # (or wire) | Check/ Wire date | Approx. amount | Undeclared U.S. taxpayer | Swiss bank where U.S. taxpayer's account was held |
|---|---|---|---|---|
| Wire | 8/15/2008 | $ 4,000.00 | Client FF | WEGELIN |
| Wire | 8/29/2008 | $ 2,000.00 | Client FF | WEGELIN |
| Wire | 9/15/2008 | $ 4,000.00 | Client FF | WEGELIN |
| Wire | 10/1/2008 | $ 2,000.00 | Client FF | WEGELIN |
| Wire | 10/31/2008 | $ 2,000.00 | Client FF | WEGELIN |
| Wire | 11/14/2008 | $ 4,000.00 | Client FF | WEGELIN |
| 3416 | 11/25/2008 | $ 8,500.00 | Client A | WEGELIN |
| 3417 | 11/25/2008 | $ 8,500.00 | Client A | WEGELIN |
| 3418 | 11/25/2008 | $ 8,500.00 | Client A | WEGELIN |
| 3421 | 11/28/2008 | $ 8,500.00 | Client HH | WEGELIN |
| Wire | 12/1/2008 | $ 2,000.00 | Client FF | WEGELIN |
| Wire | 12/15/2008 | $ 4,000.00 | Client FF | WEGELIN |
| Wire | 12/31/2008 | $ 2,000.00 | Client FF | WEGELIN |
| 3468 | 1/5/2009 | $ 8,500.00 | Client A | WEGELIN |
| 3469 | 1/5/2009 | $ 8,500.00 | Client A | WEGELIN |
| 3470 | 1/5/2009 | $ 8,500.00 | Client A | WEGELIN |
| Wire | 1/6/2009 | $ 11,000.00 | Client A | WEGELIN |
| Wire | 1/15/2009 | $ 4,000.00 | Client FF | WEGELIN |
| 3483 | 1/26/2009 | $ 8,500.00 | Client HH | WEGELIN |
| Wire | 1/30/2009 | $ 2,000.00 | Client FF | WEGELIN |
| Wire | 2/13/2009 | $ 4,000.00 | Client FF | WEGELIN |
| 3510 | 2/26/2009 | $ 8,500.00 | Client A | WEGELIN |
| 3512 | 2/26/2009 | $ 8,500.00 | Client A | WEGELIN |
| 3511 | 2/26/2009 | $ 8,500.00 | Client A | WEGELIN |
| 3509 | 2/26/2009 | $ 8,500.00 | Client HH | WEGELIN |
| Wire | 2/27/2009 | $ 2,000.00 | Client FF | WEGELIN |
| Wire | 3/13/2009 | $ 4,000.00 | Client FF | WEGELIN |
| 3532 | 3/25/2009 | $ 8,500.00 | Client HH | WEGELIN |
| Wire | 4/1/2009 | $ 2,000.00 | Client FF | WEGELIN |
| Wire | 4/15/2009 | $ 4,000.00 | Client FF | WEGELIN |
| Wire | 4/21/2009 | $ 20,000.00 | Client A | WEGELIN |
| 3552 | 4/21/2009 | $ 8,500.00 | Client A | WEGELIN |
| 3553 | 4/21/2009 | $ 8,500.00 | Client A | WEGELIN |
| 3554 | 4/21/2009 | $ 8,500.00 | Client A | WEGELIN |
| 3556 | 4/24/2009 | $ 8,500.00 | Client HH | WEGELIN |
| Wire | 5/1/2009 | $ 2,000.00 | Client FF | WEGELIN |
| Wire | 5/15/2009 | $ 4,000.00 | Client FF | WEGELIN |
| Wire | 5/22/2009 | $ 4,000.00 | Client FF | WEGELIN |
| 3568 | 5/25/2009 | $ 8,500.00 | Client HH | WEGELIN |
| Wire | 6/1/2009 | $ 2,000.00 | Client FF | WEGELIN |
| 3571 | 6/8/2009 | $ 10,000.00 | K. Heller | WEGELIN |
| Wire | 6/11/2009 | $ 6,000.00 | Client FF | WEGELIN |
| Wire | 6/15/2009 | $ 4,665.00 | Client FF | WEGELIN |
| Wire | 7/1/2009 | $ 3,500.00 | Client FF | WEGELIN |
| 3592 | 7/8/2009 | $ 2,500.00 | K. Heller | WEGELIN |
| 3583 | 7/8/2009 | $ 2,500.00 | K. Heller | WEGELIN |
| 3587 | 7/8/2009 | $ 2,500.00 | K. Heller | WEGELIN |
| 3586 | 7/8/2009 | $ 2,500.00 | K. Heller | WEGELIN |
| 3589 | 7/8/2009 | $ 2,500.00 | K. Heller | WEGELIN |

| Check # (or wire) | Check/ Wire date | Approx. amount | Undeclared U.S. taxpayer | Swiss bank where U.S. taxpayer's account was held |
|---|---|---|---|---|
| 3590 | 7/8/2009 | $ 2,500.00 | K. Heller | WEGELIN |
| 3588 | 7/8/2009 | $ 2,500.00 | K. Heller | WEGELIN |
| 3591 | 7/8/2009 | $ 2,500.00 | K. Heller | WEGELIN |
| 3593 | 7/8/2009 | $ 2,500.00 | K. Heller | WEGELIN |
| 3595 | 7/8/2009 | $ 2,500.00 | K. Heller | WEGELIN |
| 3585 | 7/8/2009 | $ 2,500.00 | K. Heller | WEGELIN |
| 3584 | 7/8/2009 | $ 2,500.00 | K. Heller | WEGELIN |
| Wire | 7/13/2009 | $ 24,000.00 | Client A | WEGELIN |
| Wire | 7/15/2009 | $ 4,665.00 | Client FF | WEGELIN |
| 3623 | 7/16/2009 | $ 2,500.00 | K. Heller | WEGELIN |
| Wire | 7/20/2009 | $ 24,000.00 | Client A | WEGELIN |
| Wire | 7/31/2009 | $ 3,500.00 | Client FF | WEGELIN |
| Wire | 8/14/2009 | $ 4,665.00 | Client FF | WEGELIN |
| 3660 | 8/25/2009 | $ 5,500.00 | Client A | WEGELIN |
| 3659 | 8/25/2009 | $ 8,500.00 | Client A | WEGELIN |
| Wire | 9/1/2009 | $ 3,500.00 | Client FF | WEGELIN |
| 3736 | 9/11/2009 | $ 37,813.97 | K. Heller | WEGELIN |
| Wire | 9/15/2009 | $ 20,000.00 | Client A | WEGELIN |
| Wire | 9/15/2009 | $ 4,665.00 | Client FF | WEGELIN |
| 3747 | 9/22/2009 | $ 25,000.00 | K. Heller | WEGELIN |
| 3746 | 9/22/2009 | $ 50,000.00 | K. Heller | WEGELIN |
| 3745 | 9/22/2009 | $ 50,000.00 | K. Heller | WEGELIN |
| 3744 | 9/22/2009 | $ 50,000.00 | K. Heller | WEGELIN |
| 3750 | 9/24/2009 | $ 16,000.00 | K. Heller | WEGELIN |
| Wire | 10/1/2009 | $ 3,500.00 | Client FF | WEGELIN |
| 3778 | 10/2/2009 | $ 7,250.00 | K. Heller | WEGELIN |
| 3779 | 10/2/2009 | $ 500.00 | K. Heller | WEGELIN |
| 3794 | 10/13/2009 | $ 2,498.04 | K. Heller | WEGELIN |
| Wire | 10/15/2009 | $ 4,665.00 | Client FF | WEGELIN |
| 3796 | 10/21/2009 | $ 45,000.00 | Client JJ | Swiss Bank C |
| Wire | 10/30/2009 | $ 3,500.00 | Client FF | WEGELIN |
| Wire | 11/13/2009 | $ 4,665.00 | Client FF | WEGELIN |
| Wire | 12/1/2009 | $ 3,500.00 | Client FF | WEGELIN |
| Wire | 12/15/2009 | $ 4,665.00 | Client FF | WEGELIN |
| Wire | 1/4/2010 | $ 3,500.00 | Client FF | WEGELIN |
| Wire | 1/15/2010 | $ 4,665.00 | Client FF | WEGELIN |
| 3926 | 1/22/2010 | $ 45,000.00 | Client JJ | Swiss Bank C |
| Wire | 2/1/2010 | $ 3,500.00 | Client FF | WEGELIN |
| Wire | 2/12/2010 | $ 4,665.00 | Client FF | WEGELIN |
| Wire | 3/1/2010 | $ 3,500.00 | Client FF | WEGELIN |
| Wire | 3/9/2010 | $ 100,000.00 | Client A | WEGELIN |
| Wire | 3/15/2010 | $ 4,665.00 | Client FF | WEGELIN |
| Wire | 4/1/2010 | $ 3,500.00 | Client FF | WEGELIN |
| 4060 | 4/6/2010 | $ 45,000.00 | Client JJ | Swiss Bank C |
| Wire | 4/15/2010 | $ 4,665.00 | Client FF | WEGELIN |
| Wire | 4/30/2010 | $ 3,500.00 | Client FF | WEGELIN |
| Wire | 5/14/2010 | $ 4,665.00 | Client FF | WEGELIN |
| Wire | 6/1/2010 | $ 3,500.00 | Client FF | WEGELIN |
| Wire | 6/15/2010 | $ 4,665.00 | Client FF | WEGELIN |

| Check # (or wire) | Check/ Wire date | Approx. amount | Undeclared U.S. taxpayer | Swiss bank where U.S. taxpayer's account was held |
|---|---|---|---|---|
| Wire | 6/22/2010 | $ 37,000.00 | Client EE | WEGELIN |
| Wire | 7/15/2010 | $ 4,665.00 | Client FF | WEGELIN |
| Wire | 8/13/2010 | $ 4,665.00 | Client FF | WEGELIN |
| Wire | 8/13/2010 | $ 7,358.00 | Client EE | WEGELIN |
| Wire | 8/18/2010 | $ 18,910.00 | Client EE | WEGELIN |
| Wire | 9/15/2010 | $ 4,665.00 | Client FF | WEGELIN |
| Wire | 10/15/2010 | $ 4,665.00 | Client FF | WEGELIN |
| Wire | 11/15/2010 | $ 4,665.00 | Client FF | WEGELIN |
| 4361 | 12/9/2010 | $ 4,833.00 | Client II | Swiss Bank C |
| 4363 | 12/10/2010 | $ 4,922.00 | Client II | Swiss Bank C |
| Wire | 12/15/2010 | $ 4,665.00 | Client FF | WEGELIN |
| Wire | 1/14/2011 | $ 4,665.00 | Client FF | WEGELIN |
| 4411 | 1/25/2011 | $ 45,000.00 | Client JJ | Swiss Bank C |
| 4416 | 1/28/2011 | $ 3,600.00 | Client II | Swiss Bank C |
| 4417 | 1/28/2011 | $ 2,850.00 | Client II | Swiss Bank C |
| Wire | 2/15/2011 | $ 4,665.00 | Client FF | WEGELIN |
| Wire | 3/15/2011 | $ 4,665.00 | Client FF | WEGELIN |
| 4483 | 3/17/2011 | $ 4,883.00 | Client II | Swiss Bank C |
| 4489 | 3/23/2011 | $ 45,000.00 | Client JJ | Swiss Bank C |
| Wire | 4/15/2011 | $ 4,665.00 | Client FF | WEGELIN |
| Wire | 5/13/2011 | $ 4,665.00 | Client FF | WEGELIN |
| Wire | 6/15/2011 | $ 4,665.00 | Client FF | WEGELIN |
| Wire | 7/15/2011 | $ 4,665.00 | Client FF | WEGELIN |
| Wire | 8/15/2011 | $ 4,665.00 | Client FF | WEGELIN |
| TOTAL | | $ 1,417,626.01 | | |

## Statutory Allegations

138. From at least in or about 2002 up through and including in or about 2011, in the Southern District of New York and elsewhere, WEGELIN, MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, together with Managing Partner A, Executive A, Client Advisor A, Beda Singenberger, Gian Gisler, Clients A through JJ, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to defraud the United States of America and an agency thereof, to wit, the IRS, and to commit

55

offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7206(1) and 7201.

139. It was a part and an object of the conspiracy that WEGELIN, MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, together with others known and unknown, willfully and knowingly would and did defraud the United States of America and the IRS for the purpose of impeding, impairing, obstructing, and defeating the lawful governmental functions of the IRS in the ascertainment, computation, assessment, and collection of revenue, to wit, federal income taxes.

140. It was further a part and an object of the conspiracy that various U.S. taxpayer-clients of WEGELIN, MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, together with others known and unknown, willfully and knowingly would and did make and subscribe returns, statements, and other documents, which contained and were verified by written declarations that they were made under the penalties of perjury, and which these U.S. taxpayer-clients, together with others known and unknown, did not believe to be true and correct as to every material matter, in violation of Title 26, United States Code, Section 7206(1).

141. It was further a part and an object of the conspiracy that WEGELIN, MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, together with others known and unknown, willfully

56

and knowingly would and did attempt to evade and defeat a substantial part of the income tax due and owing to the United States by certain of WEGELIN'S U.S. taxpayer clients, in violation of Title 26, United States Code, Section 7201.

### Overt Acts

142. In furtherance of the conspiracy and to effect its illegal objects, WEGELIN, MICHAEL BERLINKA, URS FREI, ROGER KELLER, the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.  In or about September 2008, WEGELIN and BERLINKA opened a new undeclared account in the name of Client A.

b.  On or about November 25, 2008; January 5, 2009; February 26, 2009; April 21, 2009; and August 25, 2009, WEGELIN and BERLINKA sent multiple checks drawn on the Stamford Correspondent Account to Client A in the United States.

c.  On various occasions from in or about 2003 up to and including in or about 2009, Independent Asset Manager B met Client HH for dinner in Manhattan and gave her U.S. currency withdrawn from her undeclared WEGELIN account.

d.  On or about August 8 and August 9, 2007, WEGELIN and FREI wired approximately $16,000 in two transactions to Client GG's U.S. bank account in Westchester County.

e.  On or about August 21, 2007, at a restaurant in Manhattan, Client GG provided approximately $16,000 in U.S. currency to FREI, who then provided it to FREI's Other Client.

f.  On or about November 4, 2008, WEGELIN and KELLER opened a new undeclared account in the name of Client P's son, a resident of Manhattan, for the purpose of helping Client P hide assets and income from the IRS.

g.  On or about October 2, 2008, Kenneth Heller caused his employee to send, by fax and U.S. mail, instructions from Manhattan to WEGELIN directing it to wire approximately $50,000 to an account that HELLER controlled in the United States.

h.  On various dates from in or about 2006 up through and including in or about 2009, WEGELIN, BERLINKA, FREI, and KELLER sent Federal Express packages relating to WEGELIN's U.S. taxpayer-client business to addresses in the United States, including a Federal Express package from WEGELIN to FREI at a hotel in Manhattan on or about August 14, 2007.

(Title 18, United States Code, Section 371.)


_____
FOREPERSON

_Preet Bharara_
PREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

**WEGELIN & CO.,**
**MICHAEL BERLINKA,**
**URS FREI, and**
**ROGER KELLER,**

**Defendants.**

### INDICTMENT

S1 12 Cr. 02 (JSR)

18 U.S.C. § 371

PREET BHARARA
United States Attorney.

**A TRUE BILL**

_____ Foreperson.

Feb 2, 2012

Sealed Indictment Filed.

U.S.M.J. Debra Freeman.