UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,              :          **SUPERSEDING**
                                                  **INDICTMENT**
          -v.-                         :
                                                  S2 12 Cr. 02 (JSR)
MICHAEL BERLINKA,                      :
URS FREI, and
ROGER KELLER,                          :

          Defendants.                  :

- - - - - - - - - - - - - - - - - -x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: FEB 18 2015
```

### COUNT ONE
### (Conspiracy)

          The Grand Jury charges:

### The Defendants and Co-Conspirators

          1.   At all times relevant to this Indictment, Wegelin &
Co. ("Wegelin"), a co-conspirator not named as a defendant
herein, was Switzerland's oldest bank.  Wegelin provided private
banking, asset management, and other services to individuals and
entities around the world, including U.S. taxpayers living in
the Southern District of New York.  Wegelin provided these
services principally through "client advisors" based in its
various branches in Switzerland ("Client Advisors").  Wegelin
was principally owned by eight managing partners (the "Managing
Partners") and was governed by an executive committee that
included the Managing Partners (the "Executive Committee").
Wegelin had no branches outside Switzerland, but it directly

accessed the U.S. banking system through a correspondent account that it held at UBS AG ("UBS") in Stamford, Connecticut (the "Stamford Correspondent Account").  As of in or about December 2010, Wegelin had 12 branches in Switzerland and approximately $25 billion in assets under management.

2.    From at least in or about 2008 up through and including in or about 2010, MICHAEL BERLINKA, the defendant, was a Client Advisor at the Zurich branch of Wegelin (the "Zurich Branch").

3.    From at least in or about 2006 up through and including in or about 2010, URS FREI, the defendant, was a Client Advisor at the Zurich Branch of Wegelin.

4.    From at least in or about 2007 up through and including in or about 2010, ROGER KELLER, the defendant, was a Client Advisor at the Zurich Branch of Wegelin.

5.    From in or about 2005 up through and including in or about 2010, Client Advisor A, a co-conspirator not named as a defendant herein, was a Client Advisor at the Zurich Branch.  At various times, Client Advisor A also served as the "team leader" of MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, and certain other Client Advisors of the Zurich Branch.  As a team leader, Client Advisor A coordinated certain activities of, but did not supervise, these and other Client Advisors.

6.     From in or about 2007 up through and including in or about 2012, Managing Partner A, a co-conspirator not named as a defendant herein, was one of the Managing Partners of Wegelin. From in or about 2005 up through and including in or about 2011, Managing Partner A was the head of Wegelin's Zurich Branch. During that period, Managing Partner A supervised MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, Client Advisor A, and other Client Advisors in the Zurich Branch with respect to, among other things, the opening and servicing of "undeclared accounts" for U.S. taxpayers.   "Undeclared accounts" are bank and securities accounts owned by U.S. taxpayers whose assets, and the income generated by the assets, were not reported by the U.S. taxpayers to the taxation authority of the United States, the Internal Revenue Service ("IRS").

7.     From in or about 2008 up through and including in or about 2011, Executive A, a co-conspirator not named as a defendant herein, was a member of the Executive Committee of Wegelin, and worked primarily at the Zurich Branch.

8.     At all times relevant to this Indictment, Beda Singenberger ("Singenberger"), a co-conspirator not named as a defendant herein, was an independent asset manager for various U.S. taxpayers who held undeclared accounts at Wegelin, UBS, Swiss Bank A, and other Swiss banks.   Singenberger helped his U.S. taxpayer-clients, Wegelin, UBS, Swiss Bank A and other

Swiss banks hide such accounts, and the income generated therein, by, among other things, selling sham corporations and foundations to U.S. taxpayers as vehicles through which the U.S. taxpayers could hold their undeclared accounts, and by managing the assets held in such accounts.  From at least in or about 2002 to in or about 2006, Singenberger regularly traveled to the Southern District of New York and other places in the United States to meet with his U.S. taxpayer-clients with undeclared accounts at Wegelin, UBS, and other Swiss banks.

9.    From in or about the mid-1990s up through and including in or about late 2008, Gian Gisler ("Gisler"), a co-conspirator not named as a defendant herein, was a client advisor at UBS in Switzerland.  From in or about early 2009 up through and including in or about mid to late 2009, Gisler was an independent asset manager for U.S. taxpayers holding undeclared accounts at Wegelin, UBS, and other Swiss banks.

## Obligations of United States Taxpayers
## With Respect to Foreign Financial Accounts

10.    At all times relevant to this Indictment, citizens and residents of the United States who had income in any one calendar year in excess of a threshold amount ("U.S. taxpayers") were required to file a U.S. Individual Income Tax Return ("Form 1040"), for that calendar year with the IRS.  On Form 1040, U.S. taxpayers were obligated to report their worldwide income,

including income earned in foreign bank accounts.   In addition,
when a U.S. taxpayer completed Schedule B of Form 1040, he or
she was required to indicate whether, at any time during the
relevant year, the filer had "an interest in or a signature or
other authority over a financial account in a foreign country,
such as a bank account, securities account, or other financial
account."   If so, the U.S. taxpayer was required to name the
country.

11.   In addition, U.S. taxpayers who had a financial
interest in, or signature or other authority over, a foreign
bank account with an aggregate value of more than $10,000 at any
time during a given calendar year were required to file with the
IRS a Report of Foreign Bank and Financial Accounts, Form TD F
90-22.1 ("FBAR") on or before June 30 of the following year.   In
general, the FBAR required that the U.S. taxpayer identify the
financial institution where the account was held, the type of
account, the account number, and the maximum value of the
account during the relevant calendar year.

Overview of the Conspiracy

12.   From at least in or about 2002 up through and
including in or about 2011, more than 100 U.S. taxpayers
conspired with, at various times, MICHAEL BERLINKA, URS FREI,
and ROGER KELLER, the defendants, Wegelin, Managing Partner A,
Client Advisor A, other Client Advisors at Wegelin, Beda

5

Singenberger, Gian Gisler, and others known and unknown, to defraud the United States by concealing from the IRS undeclared accounts owned by U.S. taxpayers at Wegelin. As of in or about 2010, the total value of undeclared accounts held by U.S. taxpayers at Wegelin was at least $1.2 billion.

13. Among other things, MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, Wegelin, and other Client Advisors opened dozens of new undeclared accounts for U.S. taxpayers in or about 2008 and 2009 after UBS and another large international bank based in Switzerland ("Swiss Bank B") closed their respective businesses servicing undeclared accounts for U.S. taxpayers (the "U.S. cross-border banking businesses") in the wake of widespread news reports in Switzerland and the United States that the IRS was investigating UBS for helping U.S. taxpayers evade taxes and hide assets in Swiss bank accounts. BERLINKA, FREI, KELLER, Wegelin, Client Advisor A and other Client Advisors did so after Wegelin's Executive Committee affirmatively decided to capture for Wegelin the illegal U.S. cross-border banking business lost by UBS and deliberately set out to open new undeclared accounts for U.S. taxpayer-clients leaving UBS. At or about the time this policy decision was announced to team leaders within Wegelin, Executive A told the team leaders that Wegelin was not exposed to the risk of prosecution that UBS faced in the United States because Wegelin

was smaller than UBS, and that Wegelin could charge high fees to its new U.S. taxpayer-clients because the clients were afraid of criminal prosecution in the United States.  As a result of this influx of former UBS U.S. taxpayer-clients into Wegelin, Wegelin's undeclared U.S. taxpayer assets under management, and the fees earned by managing those assets, increased substantially.

14.   As part of their sales pitch to U.S. taxpayer-clients who were fleeing UBS, at various times, BERLINKA, FREI, KELLER, and other Client Advisors told U.S. taxpayer-clients, in substance, that their undeclared accounts at Wegelin would not be disclosed to the United States authorities because Wegelin had a long tradition of bank secrecy and, unlike UBS, did not have offices outside Switzerland, thereby making Wegelin less vulnerable to United States law enforcement pressure.  Managing Partner A and Executive A participated in some of the meetings where such statements were made to U.S. taxpayers.

15.   In furtherance of the conspiracy to defraud the United States, Wegelin helped certain U.S. taxpayer-clients repatriate undeclared funds to the United States by issuing checks drawn on, and executing wire transfers through, Wegelin's Stamford Correspondent Account for the benefit of the U.S. taxpayer-clients.  In addition, Wegelin helped at least two other Swiss banks repatriate undeclared funds to their own U.S.

taxpayer-clients by issuing checks drawn on Wegelin's Stamford Correspondent Account for the benefit of the clients of the two other Swiss banks.

## Means and Methods of the Conspiracy

16.  Among the means and methods by which MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, and their co-conspirators carried out the conspiracy were the following:

a.  BERLINKA, FREI, KELLER and Wegelin opened and serviced undeclared accounts for U.S. taxpayers -- sometimes in the name of sham corporations and foundations established under the laws of Panama, Hong Kong, and Liechtenstein -- for the purpose of helping the U.S. taxpayers hide assets and income from the IRS.

b.  FREI and Wegelin knowingly accepted bank documents falsely declaring that such sham entities beneficially owned certain accounts, when FREI and Wegelin knew that U.S. taxpayers beneficially owned such accounts.

c.  BERLINKA, FREI and Wegelin opened undeclared accounts for U.S. taxpayers using code names and numbers (so-called "numbered accounts") so that the U.S. taxpayers' names would appear on as few documents as possible in the event that the documents fell into the hands of third parties.

d.   BERLINKA, FREI, KELLER and Wegelin ensured that account statements and related documents were not mailed to their U.S. taxpayer-clients in the United States.

e.   BERLINKA, KELLER and Wegelin sent e-mails and Federal Express packages to potential U.S. taxpayer-clients in the United States to solicit new private banking and asset management business.

f.   At various times from in or about 2005 up through and including in or about 2007, BERLINKA, FREI, KELLER and Wegelin communicated by e-mail and/or telephone with U.S. taxpayer-clients who had undeclared accounts at Wegelin.  Client Advisors sometimes used their personal e-mail accounts to communicate with U.S. taxpayers to reduce the risk of detection by United States law enforcement authorities.

g.   Beginning in or about late 2008 or early 2009, and after Wegelin began to open new undeclared accounts for U.S. taxpayers fleeing UBS, Managing Partner A instructed BERLINKA, FREI, KELLER and other Client Advisors of the Zurich Branch not to communicate with their U.S. taxpayer-clients by telephone or e-mail, but rather to cause their U.S. taxpayer-clients to travel from the United States to Switzerland to conduct business relating to their undeclared accounts.

h.   Various U.S. taxpayer-clients of BERLINKA, FREI, KELLER and Wegelin filed Forms 1040 that falsely and

fraudulently failed to report the existence of, and the income generated from, their undeclared Wegelin accounts; evaded substantial income taxes due and owing to the IRS; and failed to file timely FBARs identifying their undeclared accounts.

i.    Upon request, Wegelin issued checks drawn on, and executed wire transfers through, the Stamford Correspondent Account for the benefit of U.S. taxpayers with undeclared accounts at Wegelin and at least two other Swiss banks.  When doing so, Wegelin sometimes separated the transactions into batches of checks or multiple wire transfers of $10,000 or less to reduce the risk that the IRS would detect the undeclared accounts.

j.    To further conceal the nature of these transactions, Wegelin comingled the funds transferred in this fashion with millions of dollars of additional funds that Wegelin moved through the Stamford Correspondent Account.

### Wegelin Solicited New Undeclared Accounts Through a Third-Party Website

17.   From in or about 2005 up through and including in or about 2009, Wegelin solicited new business from U.S. taxpayers wishing to open undeclared accounts in Switzerland by recruiting clients through the website "SwissPrivateBank.com," which was operated by a third party independent of Wegelin (the "Website Operator").  As of on or about July 2, 2007, this website

advertised "Swiss Numbered Bank Account[s]" and "Swiss Anonymous Bank Account[s]."  Specifically, the website stated:

> Swiss banking laws are very strict and it is illegal for a banker to reveal the personal details of an account number unless ordered to do so by a judge.
>
> This is long established in Swiss law. Any banker who reveals information about you without your consent risks a custodial sent[e]nce if convicted, with the only exceptions to this rule concerning serious violent crimes.
>
> Swiss banking secrecy is not lifted for tax evasion. The reason for this is because failure to report income or assets is not considered a crime under Swiss banking law. As such, neither the Swiss government, nor any other government, can obtain information about your bank account. They must first convince a Swiss judge that you have committed a serious crime punishable by the Swiss Penal Code.

The website invited users to "[r]equest a Swiss banking consultation today" by clicking a link to a "Consultation Request" form that asked for information about a user's country of residence, telephone number, and e-mail address.  The Website Operator provided this information to Wegelin Client Advisors, who then sent e-mails to the United States promoting Wegelin's private banking and asset management services.  In some cases, Client Advisors sent Wegelin's promotional materials to U.S. taxpayers in the United States by Federal Express.  Through this website, over time, Wegelin obtained new undeclared accounts holding millions of dollars in total for U.S. taxpayers. Managing Partner A and other managing partners of Wegelin

received quarterly updates on the progress of this advertising program.  Managing Partner A approved payments to the Website Operator.

### Wegelin Opens New Undeclared Accounts
### For U.S. Taxpayers Fleeing UBS

18.  In or about May and June 2008, the IRS's criminal investigation of UBS's U.S. cross-border banking business received widespread media coverage in Switzerland and the United States.  At or about that time, many U.S. taxpayers with undeclared accounts at UBS understood that the investigation might result in the disclosure of their identities and UBS account information to the IRS.

19.  On or about July 17, 2008, UBS announced that it was closing its U.S. cross-border banking business.  Thereafter, UBS client advisors began to notify their U.S. taxpayer-clients that UBS was closing their undeclared accounts.  Some UBS client advisors told such clients that they could continue to maintain undeclared accounts at Wegelin and certain other Swiss private banks.  At or about that time, it became widely known in Swiss private banking circles that Wegelin was opening new undeclared accounts for U.S. taxpayers.

20.  In or about 2008, the Executive Committee of Wegelin, including its Managing Partners, affirmatively decided to capture the illegal U.S. cross-border banking business lost by

UBS by opening new undeclared accounts for U.S. taxpayer-clients fleeing UBS.  In or about 2008, Managing Partner A announced this decision to Client Advisor A and other team leaders of the Zurich Branch.  At or about the time of this announcement, Executive A told the team leaders that Wegelin was not exposed to the risk of prosecution that UBS faced because Wegelin was smaller than UBS, and that Wegelin could charge high fees to its new U.S. taxpayer-clients because the clients were afraid of criminal prosecution in the United States.

21.  At or about that time, Managing Partner A supervised the creation of a list of Client Advisors at the Zurich Branch who were available to meet with potential U.S. taxpayer-clients, many of whom walked into the Zurich Branch of Wegelin seeking to open new undeclared accounts.  Thereafter, in or about 2008 and 2009, MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants, and other Client Advisors met with at least 70 such potential clients.  In these meetings, BERLINKA, FREI, KELLER and other Client Advisors interviewed the potential U.S. taxpayer-clients about their backgrounds, the sources of their funds, and the amount of money they wished to transfer from UBS to Wegelin, among other things.  During these meetings, the U.S. taxpayers typically showed their U.S. passports, advised that they were U.S. citizens or legal permanent residents, confirmed that UBS was closing their accounts, and completed certain

account opening documents.   These documents typically included a
standard Swiss banking form called "Form A," which clearly
identified the U.S. taxpayers as the beneficial owners of the
accounts.   In some cases, as described in more detail below, the
Client Advisors sought to reassure their new U.S. taxpayer-
clients that Wegelin would not disclose their identities or
account information to the IRS.   In many cases, Managing Partner
A or Executive A joined these meetings.

22.   In preparation for these meetings, Managing Partner A
and Executive A supervised videotaped training sessions with
Client Advisors of the Zurich Branch to instruct them on their
delivery of certain selling points to be made to U.S. taxpayers
fleeing UBS.   These selling points included the fact that
Wegelin had no branches outside Switzerland and was small,
discreet, and, unlike UBS, not in the media.

23.   In this manner, Wegelin opened new undeclared accounts
for at least 70 U.S. taxpayers who had fled UBS in or about 2008
and 2009.   Most were opened at Wegelin's Zurich Branch.   When
these new undeclared accounts were opened at the Zurich Branch,
they were designated with a special code -- "BNQ" -- indicating
internally within Wegelin, among other things, that the accounts
were undeclared.   At some point in or about 2008 or 2009, the
Zurich Branch required that the opening of all new U.S. taxpayer
accounts be approved by Managing Partner A or Executive A.

14

24.   From in or about March 2009 up through and including
in or about October 2009, pursuant to a special IRS program for
U.S. taxpayers with undeclared accounts (the "Offshore Voluntary
Disclosure Program"), approximately 14,000 U.S. taxpayers
voluntarily disclosed to the IRS undeclared accounts held at
banks around the world, including Wegelin.  As part of this
process, dozens of U.S. taxpayers obtained copies of their
Wegelin bank records.  Some of these records included the names
of MICHAEL BERLINKA, URS FREI, and ROGER KELLER, the defendants,
and other Client Advisors.  In response to the expected
disclosure of Client Advisors' names to the IRS through the
voluntary disclosure program, in or about 2009, Managing Partner
A announced to team leaders of the Zurich Branch that Client
Advisors' names would no longer appear on certain Wegelin
records.  From at least in or about late 2009 up through and
including in or about early 2010, Client Advisors' names were
replaced by "Team International," or a similar designation, on
certain Wegelin records, so as to reduce the risk that Client
Advisors' names would become known to the IRS.

25.   In or about mid-2009, the Executive Committee of
Wegelin decided that the bank would stop opening new undeclared
accounts for U.S. taxpayers, but that Wegelin would continue to
service its existing undeclared U.S. taxpayer accounts.
Nevertheless, in or about late 2009 or early 2010, MICHAEL

15

BERLINKA, the defendant, Executive A and Wegelin opened at least three new undeclared accounts for U.S. taxpayers who had fled from Swiss Bank A when it, like UBS and Swiss Bank B, closed its U.S. cross-border banking business for both new and existing U.S. taxpayer-clients. Each of the three new U.S. taxpayer-clients had at least two passports: one from the United States and one from a second country. In each case, BERLINKA, Executive A and Wegelin opened the new undeclared account under the passport of the second country, even though BERLINKA, Executive A and Wegelin well knew that the U.S. taxpayer had a U.S. passport.

26. After the Managing Partners of Wegelin decided to capture UBS's illegal business for themselves, the total value of undeclared accounts held by U.S. taxpayers at Wegelin increased substantially over time. As of in or about 2005, Wegelin hid at least $240 million in undeclared U.S. taxpayer assets from the IRS. By in or about 2010, this amount had risen to at least $1.2 billion.

## New Undeclared Accounts Opened at Wegelin by MICHAEL BERLINKA

27. In or about 2008 and 2009, MICHAEL BERLINKA, the defendant, and Wegelin opened new undeclared accounts for numerous U.S. taxpayers fleeing UBS, including the following:

### Client A

28.  At all times relevant to this Indictment, Client A, a co-conspirator not named as a defendant herein, lived with her husband in Boca Raton, Florida.  She became a U.S. citizen in 2003.  In or about 1987, Client A became the beneficial owner of an undeclared account at UBS and its predecessor bank.  In or about July 2008, Client A's UBS client advisor, Gian Gisler, advised Client A and her husband that she must close her UBS account because she was American.  At or about that time, Gisler instructed Client A and her husband not to call UBS from the United States, and told them that he was leaving UBS.  Gisler invited Client A to move her account with Gisler to another bank, but she declined.  Gisler then recommended Wegelin, and noted that it was a reliable bank that had no offices in the United States.

29.  In or about September 2008, Client A and her husband traveled to Zurich to close her UBS account.  By that time, Gisler had left UBS, and Client A had a new UBS client advisor. The new UBS client advisor instructed them not to call from the United States, promised that UBS would not give their information to the IRS, and recommended Wegelin as a bank at which to hold Client A's account.

30.  Also during this trip, Client A and her husband walked to Wegelin and met with MICHAEL BERLINKA, the defendant.

17

BERLINKA interviewed Client A and her husband about their personal background and the source of their funds, among other things. Client A and her husband told BERLINKA that they were U.S. citizens, showed their U.S. passports, and said that they wanted to transfer funds from UBS. BERLINKA opened a new account beneficially owned by Client A using the code name "N1641" on or about September 19, 2008. At or about that time, Wegelin accepted a Form A signed by Client A stating that Client A was the beneficial owner of the account.

31. In connection with the opening of the account, MICHAEL BERLINKA, the defendant, told Client A and her husband that they would be safe at Wegelin and that BERLINKA had been instructed not to disclose their account information to United States authorities. In addition, BERLINKA instructed Client A and her husband not to call or send faxes to Wegelin from the United States and explained that Wegelin would not send mail to them in the United States.

32. On multiple occasions in or about 2008 and 2009, Client A or her husband called BERLINKA from the United States to notify him that they would be traveling to Aruba. Once in Aruba, Client A or her husband called and/or faxed BERLINKA to request that he send checks to them in the United States. In response, BERLINKA and Wegelin sent checks drawn on the Stamford Correspondent Account from Switzerland to Client A in Boca

Raton, Florida by private letter carrier.  Wegelin issued the checks in the amount of $8,500 to help conceal the undeclared account from the IRS.  Wegelin also wired funds for the benefit of Client A through the Stamford Correspondent Account to the United States and Aruba.  These checks and wire transfers are set forth in the table accompanying paragraph 137 of this Indictment.

33.  In or about September 2009, Client A and her husband learned that their names and UBS account information might be provided to the IRS in connection with the August 2009 agreement between Switzerland and the United States to disclose UBS bank records relating to approximately 4,450 U.S. taxpayers (hereinafter, the "August 2009 Agreement").  Alarmed by this news, Client A's husband called BERLINKA from the United States.  During this call, BERLINKA advised Client A's husband not to make a voluntary disclosure to the IRS and assured him that their Wegelin account information would not be provided to the IRS.

34.  As of on or about October 8, 2008, Client A's undeclared account at Wegelin held approximately $2,332,860.

### Clients B and C

35.  MICHAEL BERLINKA, the defendant, and Wegelin opened and managed an undeclared account for a married couple, Clients B and C, co-conspirators not named as defendants herein.  At all

times relevant to this Indictment, Clients B and C were U.S. citizens and residents of Florida.

36.   In or about 2008, UBS notified Clients B and C that they must close their undeclared UBS account, which they had maintained since in or about the late 1990s.   Client B asked Gisler, his former UBS client adviser, if he knew anyone at Wegelin who could help them.   Gisler recommended MICHAEL BERLINKA, the defendant, and arranged for Clients B and C to meet BERLINKA at the Zurich Branch in or about October 2008.   At that meeting, Clients B and C showed BERLINKA their U.S. passports, provided their U.S. address, and said that they wanted to transfer approximately $900,000 from UBS to Wegelin. Managing Partner A joined the meeting and further interviewed Clients B and C.   Thereafter, Managing Partner A approved the opening of a new undeclared account for Clients B and C.

37.   At or about the time this account was opened, Wegelin accepted a Form A from Clients B and C stating that they resided in Florida and beneficially owned the account.   MICHAEL BERLINKA, the defendant, agreed on behalf of Wegelin that Wegelin would not send mail to Clients B and C in the United States and that Clients B and C could conduct business with Wegelin using a code name, "N1677."   Because Client B did not want to use his real name when calling Wegelin from the United States, BERLINKA set up the account so that Client B could use

another code name -- "Elvis" -- when he did so.  Thereafter, on one or two occasions, Client B called BERLINKA from the United States to check his account balance, which BERLINKA provided to Client B.

38.  On or about December 31, 2008, the undeclared account at Wegelin owned by Clients B and C held approximately $873,958.

39.  The following table further describes Clients A, B, and C and other U.S. taxpayers whose Client Advisor was MICHAEL BERLINKA, the defendant.  None of these U.S. taxpayers timely reported their accounts at Wegelin or the income earned therein, to the IRS on Form 1040 or the FBAR where they were required to do so.

| Beneficial Owner(s) | Code Name(s) or Nominee Name(s) in which Wegelin Account(s) Held | Approx. Dates of UBS Account(s) | Approx. Date Wegelin Account(s) Opened | Approx. High Value of Wegelin Accounts |
|---|---|---|---|---|
| Client A | N1641 | 1987-2008 | 09/2008 | $2,544,609 |
| Clients B & C | N1677; Elvis | 1998-2008 | 10/2008 | $873,000 |
| Client D | Limpopo Foundation | 1970s-2008 | 12/2008 | $30,895,000 |
| Client E | Hackate Foundation | 1999-2008 | 12/12/2008 | $1,241,644 |
| Total | | | | $35,554,253 |

## New Undeclared Accounts Opened at Wegelin by URS FREI

40.  From in or about 2006 up through and including at least in or about 2010, URS FREI, the defendant, opened and/or serviced dozens of undeclared accounts for U.S. taxpayers at Wegelin.  As of in or about 2006, FREI managed undeclared accounts for approximately 20 U.S. taxpayers holding approximately $40 million in assets.  Those figures grew

substantially over the next four years. By in or about 2010, FREI managed undeclared accounts for approximately 50 U.S. taxpayers holding approximately $260 million in assets. Within Wegelin's Zurich Branch, other Client Advisors frequently sought FREI's advice concerning their undeclared U.S. taxpayer accounts, and some Client Advisors transferred such accounts to him. In or about 2006 and 2007, FREI traveled several times to the United States for U.S. taxpayer-client business. In particular, in or about August and September 2007, FREI traveled to New York, New York, and to San Diego, San Francisco, Marina del Rey, and Santa Monica, California.

41. In or about 2008 and 2009, URS FREI, the defendant, and Wegelin opened new undeclared accounts for U.S. taxpayers who had fled UBS, including the following:

### Clients F and G

42. URS FREI, the defendant, was the Client Advisor at Wegelin for two undeclared accounts maintained by two brothers ("Clients F and G"), co-conspirators not named as defendants herein, who were, at all times relevant to this Indictment, U.S. citizens and residents of Bayside, New York.

43. In or about August 2008, Clients F and G traveled from New York to Zurich to meet with their client advisor at UBS, where they had owned separate undeclared accounts since in or about the 1960s. The UBS client advisor informed Clients F and

22

G that they must close their UBS accounts, and that other U.S. taxpayers with undeclared accounts were transferring funds to other Swiss banks, including Wegelin.

44.  Clients F and G then walked to the Zurich Branch of Wegelin, which was near UBS's Zurich office, and asked to open a new account for each of them.  There they met with URS FREI, the defendant.  FREI interviewed Clients F and G and inspected their U.S. passports.  Clients F and G told FREI that they wanted to transfer assets from UBS to Wegelin.

45.  FREI opened separate undeclared accounts for Clients F and G and assisted with the transfer of their funds from UBS to Wegelin: approximately $3.4 million for Client F and $800,000 for Client G.  In addition, FREI established the accounts in code names ("N1 PULTUSK" and "N1 DREW," respectively) so that their names would appear on a minimal number of records relating to their accounts.

46.  After opening their accounts, FREI gave his business card to Clients F and G and told them to call him if they needed anything.  Thereafter, on multiple occasions in or about 2008 and 2009, Clients F and/or G called FREI from the United States and spoke to FREI or one of his assistants about the status and growth of their accounts at Wegelin.

23

47.   In or about October 2009, the undeclared accounts owned by Clients F and G at Wegelin held approximately $3.4 million and $800,000 respectively.

### Clients H and I

48.   URS FREI, the defendant, also served as the client advisor at Wegelin for an undeclared account maintained jointly by Clients H and I, co-conspirators not named as defendants herein.   At all times relevant to this Indictment, Clients H and I were U.S. citizens and residents of New Jersey.

49.   In or about November 2008, Clients H and I's UBS client advisor notified them that they must close their undeclared UBS account.   Client H asked his UBS client advisor to refer him to another Swiss bank so that Clients H and I could continue to maintain an undeclared account.   The UBS client advisor recommended Wegelin and two other Swiss banks.

50.   Clients H and I walked to the Zurich Branch of Wegelin and met with URS FREI, the defendant.   FREI told Clients H and I that he handled American accounts for Wegelin.   FREI interviewed Clients H and I about their personal background and the amount they wished to deposit.   Clients H and I showed their U.S. passports to FREI and told him that they wanted to transfer approximately $1 million from UBS to Wegelin.

51.   On or about November 13, 2008, URS FREI, the defendant, opened a new account for Clients H and I.   At that

time, Wegelin promised Clients H and I that they could conduct business with the bank using the code name "N5771." Wegelin also promised not to send mail to Clients H and I in the United States. In addition, FREI instructed Clients H and I not to call him from the United States. Later, in or about July 2009, FREI lifted this restriction after Clients H and I informed him that they had voluntarily disclosed their Wegelin account to the IRS.

52. On or about July 14, 2009, the undeclared account owned by Clients H and I at Wegelin held approximately $1,105,593.

### Clients J and K

53. URS FREI, the defendant, also opened an undeclared account at Wegelin for Clients J and K, a married couple and co-conspirators not named as defendants herein. At all times relevant to this Indictment, Clients J and K were U.S. citizens living in Los Angeles, California.

54. In or about 2008, Clients J and K, who had maintained an undeclared account at UBS and one of its predecessor banks since in or about the 1980s, were advised by their UBS client adviser that they must close their undeclared UBS account. Clients J and K then spoke to an attorney in Los Angeles (the "Los Angeles Attorney"), who advised them to create an offshore entity to hold the account and who referred them to Wegelin and