UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,      :

      -v.-      :      S3 12 Cr. 02 (JSR)

MICHAEL BERLINKA,
URS FREI, and      :
ROGER KELLER,

      :

      Defendants.

      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

Olga I. Zverovich
Assistant United States Attorney
-Of Counsel-



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 12, 2021

**VIA ECF**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

> Re:   ***United States v. Michael Berlinka, Urs Frei, and Roger Keller***,
>        **S3 12 Cr. 02 (JSR)**

Dear Judge Rakoff:

The Government respectfully submits this sentencing memorandum in advance of the sentencing of defendants Michael Berlinka, Urs Frei, and Roger Keller (collectively, the "defendants"), currently scheduled for November 19, 2021, at 11:30 a.m.  For the reasons set forth below, the Government respectfully submits that a below-Guidelines sentence that involves some imprisonment for each of the defendants would be fair and appropriate in this case.

## I.   Factual Background

### A.  Wegelin's Criminal Conduct

Starting in the early 2000s and continuing into 2011, Wegelin & Co. ("Wegelin"), a Swiss bank, engaged in a wide-ranging conspiracy with, among others, hundreds of U.S. taxpayers to evade taxes, file false tax returns, and defraud the Internal Revenue Service (the "IRS").  As part of its efforts to assist its U.S. taxpayer-clients evade taxes, Wegelin, among other things, opened accounts for them in the names of sham foreign corporations; opened other accounts in code names so that the U.S. taxpayers' names would appear on as few documents as possible in the event that these documents were seen by anyone outside of the scheme; and used its U.S. correspondent bank account, held in Stamford, Connecticut (the "Stamford Correspondent Account"), to help U.S. taxpayers repatriate funds hidden in undeclared accounts.  (*See* Presentence Investigation Report ("PSR") for defendant Michael Berlinka ("Berlinka PSR") ¶¶ 15, 18, 19).

In early May 2018, it became public that UBS AG ("UBS"), another Swiss bank that engaged in similar conduct, was being investigated by the Department of Justice.  (Berlinka PSR ¶ 13).  As a result of the Department of Justice's investigation, U.S. clients with undeclared

1

accounts began to withdraw funds from UBS and look for other banks to accept them.  Instead of viewing UBS as an example to be avoided and closing its U.S. cross-border banking business, Wegelin capitalized greatly on this opportunity by taking affirmative steps to capture undeclared U.S. taxpayer business from UBS.  For the next year, Wegelin continued to capitalize on the illegal U.S. cross-border banking business lost by UBS and deliberately set out to open new accounts for U.S. taxpayer-clients leaving UBS.  (Berlinka PSR ¶ 14).  When these new accounts were opened at Wegelin's Zurich branch, where the defendants worked as client advisors, the accounts were designated with a special code—"BNQ"—indicating internally within Wegelin that no Form W-9 would be filed with the IRS.  (Berlinka PSR ¶ 15).  Due in large part to its efforts to capture undeclared U.S. taxpayer business from UBS, Wegelin's total assets under management ("AUM") consisting of undeclared assets held on behalf of U.S. taxpayer-clients increased from $544 million as of the end of 2007 to over $1.5 billion as of the end of 2009.  (Berlinka PSR ¶ 21).

### B.  The Defendants' Criminal Conduct

Defendants Berlinka, Frei, and Keller worked as client advisors at Wegelin's Zurich branch.  While working at Wegelin, all three defendants serviced undeclared accounts for multiple U.S. taxpayer-clients, including clients with undeclared assets who were fleeing UBS.  As part of their sales pitch to new U.S. clients who were fleeing UBS, Berlinka, Frei, and Keller reassured the clients that Wegelin would not disclose their identities or account information to the IRS, and explained that since Wegelin had no offices outside of Switzerland, it was less susceptible and less vulnerable to United States investigators.  (Berlinka PSR ¶¶ 16-17).  The defendants also took multiple affirmative steps to help their U.S. taxpayer-clients conceal their accounts from the U.S. government, including opening accounts beneficially owned by U.S. persons in the names of foreign corporations or using code names, instructing clients not to call from the United States, and implementing "mail holds" that ensured that account statements and related documents would not be mailed to the taxpayer-clients in the United States.  (Berlinka PSR ¶¶ 19-20, 28).

<u>Berlinka</u>

Berlinka joined Wegelin as a client advisor in 2008.  He was placed on the list of client advisors who would accept U.S. clients who previously banked at UBS.[1]  In 2008 and 2009, Berlinka opened new accounts for multiple U.S. taxpayers fleeing UBS, including Clients A through E described in the S1 Indictment.  The total high value of the undeclared accounts serviced by Berlinka for Clients A through E was approximately $35 million.  (Berlinka PSR ¶ 22).

Berlinka opened some accounts for U.S. taxpayers using code names.  In 2008, three former clients of UBS (Clients A, B, and C) were referred to Wegelin, where Berlinka was assigned as their new client advisor.  All three clients provided their U.S. passports to Berlinka and told Berlinka they wanted to transfer funds from UBS to Wegelin.  Berlinka opened new accounts for the clients using code names.  A total of approximately $3.2 million in undeclared

---

[1] In conjunction with Wegelin's decision to capture the exodus of UBS clients, one of the managing partners of Wegelin supervised the creation of a list of client advisors at Wegelin's Zurich branch who were available to meet with potential U.S. taxpayer-clients, many of whom walked into the Zurich branch of Wegelin seeking to open new accounts for their undeclared funds.

funds were then transferred to the clients' new undeclared accounts at Wegelin. (Berlinka PSR ¶¶ 23-24).

In servicing the account for one of the U.S. taxpayer-clients (Client A), on five separate occasions, and at the request of Client A or her husband made while the pair was traveling in Aruba, Berlinka mailed a series of checks in amounts of $8,500, structured to avoid scrutiny from the U.S. government, drawn on the Stamford Correspondent Account, from Switzerland to Client A in the United States:

| Wegelin Correspondent Bank Account Check No. | Approximate Date of Issue | Approximate Date of Negotiation | Approximate Amount |
|---|---|---|---|
| 3416 | 11/25/2008 | 1/7/2009 | $8,500 |
| 3417 | 11/25/2008 | 12/24/2008 | $8,500 |
| 3418 | 11/25/2008 | 12/11/2008 | $8,500 |
| 3468 | 1/5/2009 | 1/30/2009 | $8,500 |
| 3469 | 1/5/2009 | 2/12/2009 | $8,500 |
| 3470 | 1/5/2009 | 3/5/2009 | $8,500 |
| 3510 | 2/26/2009 | 3/10/2009 | $8,500 |
| 3511 | 2/26/2009 | 4/21/2009 | $8,500 |
| 3512 | 2/26/2009 | 4/6/2009 | $8,500 |
| 3552 | 4/21/2009 | 5/8/2009 | $8,500 |
| 3553 | 4/21/2009 | 5/20/2009 | $8,500 |
| 3554 | 4/21/2009 | 6/16/2009 | $8,500 |
| 3659 | 8/25/2009 | 10/26/2009 | $8,500 |
| 3660 | 8/25/2009 | 3/4/2010 | $8,500 |
| **Total:** | | | **$119,000** |

<u>Frei</u>

Frei, who previously worked as the managing director of a Swiss bank in the Cayman Islands and had significant prior experience in the banking business, joined Wegelin as a client advisor in 2006. While working at Wegelin, Frei had the largest number of U.S. clients with undeclared accounts, both before and after the withdrawal of U.S. clients from UBS. Within Wegelin's Zurich branch, other client advisors frequently sought Frei's advice concerning undeclared U.S. taxpayer accounts. (Presentence Investigation Report ("PSR") for defendant Urs Frei ("Frei PSR") ¶ 25).

As of 2006, Frei managed undeclared accounts for approximately 20 U.S. taxpayers holding approximately $40 million in assets. In 2006 and 2007, Frei traveled several times to the United States for U.S. taxpayer-client business. In particular, Frei traveled to Manhattan, San

Diego, San Francisco, Marina del Rey, and Santa Monica, California, all in 2007.[2] In 2008 and 2009, Frei opened new accounts at Wegelin for U.S. taxpayers with undeclared accounts leaving UBS. Ultimately, based on the Government's investigation, Frei had an estimated 50 to 70 U.S. clients with undeclared accounts and his clients' undeclared AUM totaled more than approximately $250 million. (Frei PSR ¶ 26).

Like Berlinka, Frei opened some accounts for U.S. taxpayers using code names. Clients F, G, H, I, J, K, L, and M were all former clients of UBS who were told in 2008 that they must close their accounts with the bank. These clients were then directed to Wegelin, where they met Frei as their new client advisor. Each of these clients provided their U.S. passport to Frei and told Frei they wanted to transfer funds from UBS to Wegelin. Frei opened new accounts for the clients using code names. In 2009, Clients F through M's accounts at Wegelin held approximately $8,649,319 in undeclared funds. (Frei PSR ¶¶ 27, 29).

Keller

Keller joined Wegelin as a client advisor in 2007. Keller and Frei worked on the same team while at Wegelin and, as such, they backed each other up when one was unavailable. While working at Wegelin, Keller opened and serviced accounts for dozens of U.S. taxpayers with undeclared assets. In 2008, after Wegelin made the decision to accept new U.S. taxpayers who were leaving UBS, Keller was placed on the list of client advisors to accept former UBS clients. Keller opened new accounts at Wegelin for multiple U.S. taxpayers leaving UBS. Based on the Government's investigation, by the end of 2008, Keller managed undeclared accounts for at least 30 U.S. taxpayers holding a total of approximately $120 million. (Presentence Investigation Report ("PSR") for defendant Roger Keller ("Keller PSR") ¶ 28).

Clients P and Q were both former clients of UBS who were told in 2008 that they must close their UBS accounts. The clients' respective sons traveled to Switzerland and met with Keller in order to open new accounts at Wegelin. The sons provided their U.S. passports to Keller and told Keller they wanted to transfer funds from UBS to Wegelin. Keller opened new accounts in the sons' names that were in fact beneficially owned by the clients. From September 2009 to March 2010, Clients P and Q's undeclared accounts at Wegelin held approximately $7,906,617 in undeclared funds. (Keller PSR ¶¶ 29-31).

**C. Procedural History**

On January 3, 2012, the defendants were indicted by a grand jury in this District on one felony count of conspiring to defraud the Internal Revenue Service, evade federal income taxes, and file false federal income tax returns, in violation of Title 18, United States Code, Section 371. On February 2, 2012, a superseding indictment (the "Indictment") was filed adding Wegelin as a fourth defendant. On January 3, 2013, Wegelin pleaded guilty to the charge in the Indictment. As part of its guilty plea, Wegelin admitted that its agreement to assist U.S. taxpayers in evading their U.S. tax obligations resulted in a loss to the IRS of $20,000,001. On March 4, 2013, Wegelin was sentenced and ordered to pay approximately $58 million to the United States, consisting of

---

[2] During a trip to Manhattan in 2007, Frei helped one of his U.S. taxpayer-clients repatriate funds from an undeclared account at Wegelin to the United States through the scheme described in the S1 Indictment. (*See* S1 Indictment ¶¶ 118-20).

4

approximately $20 million in restitution to the IRS; a fine of $22.05 million; and forfeiture in the approximate amount of $15.8 million, representing the gross fees earned by the bank on the undeclared accounts of U.S. taxpayers.

On or about February 2, 2015, Keller was arrested in Germany pursuant to the Government's red notice. Keller was detained pending the extradition proceedings for approximately seven months. Ultimately, extradition was denied by the German court and Keller returned to Switzerland.[3]

Since being indicted in early 2012, Berlinka, Frei, and Keller have not appeared in the United States to face the charge against them until the Government agreed to a misdemeanor resolution in early 2020. On October 1, 2020, each of the defendants appeared before the Court via video conference and pleaded guilty to one misdemeanor count of conspiring to assist U.S. taxpayers in those taxpayers' efforts to avoid paying taxes and making required returns, in violation of Title 18, United States Code, Section 371 and Title 26, United States Code, Section 7203. The parties have stipulated in the plea agreement that the defendants' Guidelines range is 30 to 37 months' imprisonment, capped by the statutory maximum sentence of 12 months' imprisonment. Accordingly, the stipulated Guidelines sentence is 12 months' imprisonment, which is consistent with the calculation by the Probation Office. The Probation Office recommends a sentence of 3 months' imprisonment for each of the defendants.

## II.    **Sentencing Legal Principles**

 "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just

---

[3] The Government expects that the time Keller spent in extradition custody in Germany will be credited by the Bureau of Prisons ("BOP") toward his sentence in this case pursuant to Title 18, United States Code, Section 3585(b)(1), which provides that "[a] defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences . . . as a result of the offense for which the sentence was imposed . . . that has not been credited against another sentence." In this case, Keller was held in custody in Germany pursuant to the Government's red notice in this case and the time he spent in custody has not been credited toward any other sentence. The credit to be granted a defendant under Section 3585(b) for time during which he was held in custody prior to sentencing is administered by the BOP. *United States v. Luna-Reynoso*, 258 F.3d 111, 117 (2d Cir. 2001); *see also United States v. Wilson*, 503 U.S. 329, 334 (1992) ("[Section] 3585(b) does not authorize a district court to compute the credit at sentencing.").

punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)). Section 3553(a) further directs the Court "in determining the particular sentence to impose" to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.  *See* 18 U.S.C. § 3553(a).

## III.   Discussion

The Government respectfully submits that a careful consideration of the Section 3553(a) factors and the purposes of sentencing supports the imposition of a below-Guidelines sentence that involves some imprisonment for each of the defendants.  In light of the restitution made by Wegelin, the Government is not seeking restitution from any of the defendants.

### A.   The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense

At the outset, the Government agrees with the defense that, in committing their crimes, the defendants were following Wegelin's institutional policy, for which Wegelin has been held criminally accountable and which the defendants neither created nor influenced.  The Government submits that this fact—stemming from the defendants' relatively low-level roles at the bank as client advisors—is a mitigating factor in this case, which supports a below-Guidelines sentence. Nonetheless, the defendants' crimes were deliberate and serious and are worthy of punishment. While working as financial professionals in Switzerland, the defendants assisted and facilitated tax evasion by numerous U.S. taxpayer-clients, resulting in substantial loss to the U.S. Treasury, of at least over $1.3 million.[4]  In sentencing Edgar Paltzer, a cooperator in another Swiss bank case, this Court described this type of conduct as follows:

No matter how you slice it, there were Swiss bankers who were knowingly, willfully, and intentionally helping U.S. citizens to evade millions of dollars in taxes. While this may not have been a violation of Swiss law, it's certainly a violation of the most elementary moral principles from the Ten Commandments on down.

(*See* Sentencing Tr. at 5, 13 Cr. 282 (JSR), Dkt. No. 147).

Indeed, the defendants had every reason to know that many of their U.S. taxpayer-clients used their accounts at Wegelin—accounts which were labeled by the bank with a special code, "BNQ"—to evade their U.S. income taxes.  The defendants accepted numerous U.S. clients, who presented their U.S. passports to the defendants and who were fleeing UBS in the wake of the Department of Justice's highly publicized criminal investigation of UBS for facilitating tax

---

[4] As discussed below, this tax loss understates the true tax loss because it includes only those U.S. taxpayer-clients of the defendants who participated in the Offshore Voluntary Disclosure Program ("OVDP").

evasion.  The defendants reassured these new U.S. clients that Wegelin would not disclose their identities or account information to the IRS, and further explained that since Wegelin had no offices outside of Switzerland, the bank was less susceptible to U.S. investigators.  In servicing these clients, the defendants took affirmative steps to help conceal the clients' undeclared accounts from the U.S. government, including by opening accounts in the names of sham foreign corporations or using code names, implementing "mail holds" to avoid sending account records to the United States, and structuring currency transfers to help clients repatriate undeclared funds without triggering scrutiny from U.S. financial institutions and the U.S. government.  Once again, none of these tactics were invented by the defendants; rather, they were part of the institutional policy at Wegelin, which the defendants were following.  But what these tactics do show is that the defendants were acting intentionally and deliberately, understanding that they were helping their clients break the laws of another country.  These educated professionals' decisions to continue to engage in this conduct over a prolonged period of time is all the more troubling and inexplicable in the wake of the UBS investigation, when it became clear that the U.S. government was investigating similar criminal conduct by another Swiss bank.  Instead of turning away and taking their talents elsewhere, the defendants chose to remain in roles that required them to onboard and service undeclared accounts and facilitate tax fraud.

The Government has assessed the defendants' relative culpability vis-à-vis each other.  The defendants are similarly situated in that they served in the same roles at Wegelin and performed similar functions relating to the bank's undeclared U.S. business.  The defendants also appear to be similarly situated in terms of their personal histories and characteristics in that all appear to have led good, productive, and otherwise law-abiding lives apart from the criminal conduct at issue in this case.  Nonetheless, comparing the defendants' backgrounds and levels of involvement, the Government believes that defendant Frei is the most culpable of the three defendants.  Prior to joining Wegelin, Frei had extensive, decades-long experience in the banking business, including prior experience servicing U.S. clients in private banking in Switzerland.  Of the three defendants, Frei joined Wegelin first, in 2006 (Keller joined in 2007, and Berlinka joined in 2008).  While working at Wegelin, Frei had the largest number of U.S. clients with undeclared accounts, both before and after the withdrawal of U.S. clients from UBS.  At his peak, Frei had an estimated 50 to 70 U.S. clients with undeclared accounts.  In light of his experience with U.S. taxpayer accounts, other client advisors sought out Frei's advice.  Finally, Frei traveled several times to the United States for U.S. taxpayer-client business.  The Government believes that the combination of these facts renders Frei most culpable among the three defendants.  Keller, who was back-up for Frei (and vice versa) and managed undeclared accounts for at least 30 U.S. taxpayers, is somewhat less culpable than Frei in the Government's view because he had less experience with U.S. taxpayers and serviced fewer undeclared accounts on their behalf at Wegelin.

Finally, Berlinka appears to be less culpable than both Frei and Keller.  Berlinka joined Wegelin in 2008 to work with Wegelin's Jewish clients.  He joined the team (on which Frei and Keller already worked) while in training and served on that team only for several months, before joining a different team.  Based on the Government's investigation, Berlinka serviced fewer U.S. taxpayer-clients and managed less in undeclared AUM on behalf of U.S. taxpayer-clients than did Frei and Keller.  Nonetheless, Berlinka engaged in many of the same techniques as his co-defendants to help U.S. clients evade their taxes.  As described above, Berlinka opened several accounts for clients fleeing UBS in code names and, on five separate occasions, engaged in

structuring of currency transfers to allow one of his U.S. taxpayer-clients to repatriate funds from her undeclared account at Wegelin to the United States without detection.[5]

## B. The Need to Afford Adequate Deterrence

The Government respectfully submits that the need to afford adequate deterrence to criminal conduct supports the imposition of a period of incarceration on the defendants. The Government does not contend that the defendants themselves need to be deterred from committing future crimes. However, general deterrence is a paramount consideration in this case. Hundreds of billions of dollars are lost every year because some U.S. taxpayers, who otherwise fully enjoy the myriad public benefits that the tax system supports, choose to shirk their responsibilities as taxpayers.[6] Tax fraud must be deterred, and effectively doing so requires meaningful sentences in cases that are prosecuted. As the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. ch. 2, pt. T, introductory cmt.

In sentencing a U.S. taxpayer, George Landegger, who concealed assets in an undeclared account at a Swiss bank (resulting in a tax loss of approximately $72,000), to two months' imprisonment, Judge Sullivan emphasized the need to afford general deterrence:

> [The defendant] not a risk of recidivism. But general deterrence does, I think, loom larger here. I think other judges have noted as much and have recognized that tax crimes are very hard to detect; they're difficult cases to investigate and prosecute. They have deep ramifications for society. It's important that a message be sent. It's important that people

---

[5] In addition, Berlinka's involvement in the offense conduct continued even after he was assigned to the new team. In particular, in late 2009 or early 2010, after Wegelin stopped opening new undeclared accounts for U.S. taxpayers (but still continued servicing the existing undeclared accounts), Berlinka and a Wegelin executive opened three new undeclared accounts for U.S. taxpayers who had fled another Swiss bank when that bank closed its U.S. cross-border banking business. Each of the three clients had at least two passports—one from the United States and one from a second country—and, in each case, Berlinka and the executive opened the new account under the passport of the second country. (*See* S1 Indictment ¶ 25).

[6] An IRS study of tax compliance estimates that only 83.1% of individuals are compliant with their tax obligations, leaving a yearly tax gap of over $458 billion dollars in unreported and uncollected taxes. *See* "Tax Gap Estimates for Tax Years 2008-2010," April 2016, *available at* https://www.irs.gov/pub/newsroom/tax%20gap%20estimates%20for%202008%20through%202 010.pdf (last accessed November 11, 2021).

understand that when they're caught, there will be consequences, in the hope they won't engage in that conduct going forward. I can't think of another way to send that message other than by signaling that serious punishment is going to follow when a person is caught. That's what's going to make rational actors think twice before engaging in this activity. I think a sentence of the sort proposed by [defense counsel], for whom I have great respect, would potentially confirm the worst suspicions of the public and convey the message that none of this matters; that there's different rules where wealthy defendants are concerned and where tax violations are concerned. So I think that that needs to be said.

(Sentencing Tr. at 81, 15 Cr. 32 (RJS), Dkt. No. 29).

The same strong need for general deterrence exists for professionals—whether attorneys, accountants, or bankers, foreign or domestic—who facilitate tax fraud by U.S. taxpayer-clients. Sophisticated and high-value U.S. taxpayers commonly engage in tax evasion by using offshore banks, scattered around the world, to hide their assets and income. In doing so, these U.S. taxpayers rely on the knowing assistance of foreign banks and financial professionals who, in exchange for fees, are willing to help these U.S. taxpayers hide their money from the U.S. government. The criminal efforts of these professionals result in untaxed accounts being hidden in such a way that requires years of investigative work to untangle, where it is even possible. Offshore crimes against the United States, which are already difficult to investigate and prosecute simply by virtue of their offshore nature, become all the more difficult to uncover when financial institutions and professionals take steps specifically designed to disguise and conceal. This conduct must be deterred.

To be sure, the strongest message of deterrence to facilitators is sent by punishing the financial institutions themselves as well as the higher-level executives who put in place the policies designed to assist U.S. taxpayers with evading their tax obligations. But the much-needed message of deterrence should not stop with them. Financial institutions that set out to facilitate tax fraud rely on the knowing assistance and participation of lower-level client advisors like the defendants, who maintain the relationships with U.S. taxpayers and are responsible for opening, servicing, and helping to conceal undeclared accounts on their behalf. To effectively combat offshore tax evasion, all bad actors in this space—the U.S. clients, the financial institutions, the higher-level executives, and client advisors like the defendants—must be deterred from engaging in this conduct.

The defendants' analysis of general deterrence amounts to saying that "[t]he Swiss banking industry has reformed, and no further general deterrence is needed or would be accomplished by imprisoning these Defendants for decade-old misdemeanors." (Def. Mem. at 17).[7] This misses the mark entirely. Whether or not "[t]he Swiss banking industry has reformed," there is no question that U.S. taxpayers are continuing to use offshore financial institutions around the world to commit tax evasion. It is therefore paramount that a strong message be sent that both committing and facilitating this criminal activity will be met with serious punishment. The Government respectfully submits that this message can only be effectively delivered through a sentence of imprisonment. The defendants' requested sentence of probation would communicate to other

---

[7] "Def. Mem." refers to the defendants' joint sentencing submission, filed on November 11, 2021. (Dkt. No. 61).

similarly situated financial professionals that assisting their clients with violating U.S. law is not something that the United States views as worthy of punishment. Coupled with the low likelihood of a successful prosecution in the first place, such a message would be unfortunate, as it would incentivize crimes rather than deter them.

## IV. <u>The Defendants' Arguments</u>

The defendants argue that, having remained in their home country of Switzerland after being indicted in this District, they were not properly labeled as "fugitives" under the Second Circuit's recent decision in *United States v. Bescond*, 7 F.4th 127 (2d Cir. 2021). The Government agrees, and submits that the PSR, which was finalized before the *Bescond* decision was issued, should be corrected in this regard. However, the fact that the defendants were not fugitives does not, in and of itself, support any downward variance. Moreover, the defendants repeatedly and improperly attempt to use the fact they chose, for the better part of a decade, to not appear in the United States to face the charges against them as a sword, describing the charges in this case as "decade-old misdemeanors" (Def. Mem. at 17) and even complaining that "the charges have effectively trapped them in Switzerland for nearly ten years" (*id.*). (*See also* Def. Mem. at 1 (noting that the defendants' criminal conduct took place "more than a decade ago"); *id.* at 17 (same)). This effort should be rejected. While the defendants had a right to remain in Switzerland, their absence from this District in the face of publicly announced charges against them certainly is not a mitigating factor and should not be leveraged in support of a lower sentence.

Next, the defendants describe career setbacks that occurred after the Indictment in this case was issued and argue that they "have already suffered significantly." (Def. Mem. at 17). However, the law is clear that career setbacks and other collateral consequences are not punishment and should not affect the Court's sentencing determination. *See United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); *United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) ("In imposing a sentence of one day with credit for the day of processing, the district court relied heavily on the fact that Musgrave had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life. '[N]one of these things are [his] sentence. Nor are they consequences of his sentence'; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." (citation omitted)).

The defendants also argue that the Guidelines operate unreasonably in this case by producing a range, 30 to 37 months in prison, that is several times more than the statutory maximum. Relatedly, the defendants argue that "the Guidelines reach their bizarre result here" by "allowing loss amount to swamp the result of the offense-level calculation." (Def. Mem. at 18-19). In the defendants' view, "this is exactly the type of offense where the amount of loss is 'largely incidental' to any assessment of culpability." (*Id.* at 19). The Government disagrees with the notion that the Guidelines should be entirely disregarded in this case. (*See* Def. Mem. at 18 (arguing that "the mechanical result offered by the Guidelines" should be "ignored"). The true tax loss, if one could be calculated, is correlated with the undeclared AUM, which in turn is correlated with both the scope and extent of the defendants' undeclared U.S. taxpayer business and the fees

that such business was generating for Wegelin.  In this case, the true tax loss as to each defendant is unknown.  Instead, the Government only had the ability to reliably calculate the tax loss associated with undeclared accounts held by those of the defendants' U.S. taxpayer-clients who entered the OVDP, which was only a subset of each defendant's undeclared U.S. taxpayer business.  The Government has no ability to reliably calculate the tax loss for the remaining clients.[8]  As such, because the tax loss ranges in this case *understate* the true tax losses, it makes little sense to argue that the Guidelines somehow *overstate* the defendants' culpability, particularly where, as here, the Guidelines range is already substantially reduced by virtue of the statutory cap. The premise of such an argument by the defense must be that the tax loss that was facilitated by the defendants' conduct is entirely irrelevant, which is plainly untrue.

Finally, the defendants observe that courts in this District and elsewhere in the country have almost uniformly imposed sentences of time served or probation on Swiss bankers charged with similar offenses.  (*See* Defense Exhibit A, Dkt. No. 61).  The Government agrees.  Critically, however, in all such cases, listed in defense's Exhibit A, where sentences of probation or time served were meted out, the defendants had cooperated with the Government—a fact that materially distinguishes the defendants in those cases from Berlinka, Frei, and Keller, none of whom cooperated.  In most of the cases cited in defense's Exhibit A, the defendants' cooperation resulted in the filing of a 5K1.1 motion based on substantial assistance to the Government; in others, it resulted in the express acknowledgement of the defendants' efforts to cooperate at sentencing.  For example, in the case of the ZKB defendants, Stephan Fellmann and Christof Reist, for whom the Government recommended a sentence of probation, the Government explained as follows in its sentencing submission:

> Despite the fact that the defendants remained beyond the reach of U.S. authorities, in the summer of 2016 they agreed to speak to prosecutors from the United States Attorney's Office in London pursuant to a safe passage letter.  At that interview, Fellmann and Reist provided truthful information, including information relating to the involvement of ZKB employees that were senior to them.  Some of the information that Fellmann and Reist provided to the Government was not previously known, and certain of that information was ultimately included in the Statement of Facts that accompanied the Deferred Prosecution Agreement entered into with ZKB.  In November 2016, the defendants decided to voluntarily surrender to U.S. authorities and flew from Switzerland to the United States.  At the time they chose to voluntarily surrender, no promises had been made by the Government regarding the potential disposition of their pending cases. Fellmann and Reist then remained in the United States from November 2016 until June 2017.  During that time, they met with the prosecutors on multiple occasions to further assist in the Government's investigation, including by providing information about the post-indictment conduct of the bank itself.

(Government's Sentencing Memorandum at 2-3, 12 Cr. 962 (JPO), Dkt. No. 44).  To take a different case, with respect to defendant Edgar Paltzer, who was sentenced by this Court, the Government described Paltzer as having set "the gold standard for cooperation" and rendering

---

[8] For this reason, because the true tax loss is unknown for each defendant, the Government believes that comparing the known (OVDP) tax losses is a poor way to assess the defendants' relative culpability.

cooperation that "has really been extraordinary in the context where cooperation was not easy." (*See* Sentencing Tr. at 7, 13 Cr. 282 (JSR), Dkt. No. 147).

Unlike the defendants in these cases, Berlinka, Frei, and Keller never cooperated with the Government, did not provide any helpful information, and, unlike Fellmann and Reist, only agreed to submit to this Court's jurisdiction after the Government agreed to a misdemeanor resolution. The defense asserts that "Wegelin dissuaded Defendants from taking any affirmative steps to resolve their individual cases" and that Wegelin's prompt guilty plea (within a year of indictment) "left them with little remaining opportunity to cooperate" because they "had little contact with and no useful information against any higher level principals and managing officials at the bank." (Def. Mem. at 12-13). The Government has some doubts that, having worked at Wegelin for several years, the defendants had no useful information whatsoever about misconduct by any higher-level executives. But even if that was the case, the defendants' lack of cooperation, whatever the reason, makes this case an ill-suited candidate for comparison to the cases listed in defense's Exhibit A.

## V.    __Conclusion__

For the reasons set forth below, the Government respectfully submits that a below-Guidelines sentence that involves some imprisonment for each of the defendants would be fair and appropriate. The Government further respectfully submits that the defendants' requested sentence of probation would not satisfy the purposes of sentencing in this case.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

_____
Olga I. Zverovich
Assistant United States Attorney
(212) 637-2514

cc: Defense Counsel (by ECF)